(No. 21249.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES O. MONROE, Plaintiff in Error.

*Opinion filed July 26, 1932.*

DUNN, J., dissenting.

R. GUY KNEEDLER, (RICHARD G. KNEEDLER, JR., of counsel,) for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Alvin C. Bohm, State's Attorney, J. J. Neiger, and M. L. Welch, for the People.

Kramer, Campbell, Costello & Wiechert, for the Illinois Turf Association, *amicus curiæ*.

Mr. Chief Justice Heard delivered the opinion of the court:

Plaintiff in error, James O. Monroe, was sentenced in the county court of Madison county for violations of "An act to provide for, regulate and license horse racing in the State of Illinois; to legalize and permit the pari-mutuel or certificate method of wagering on the result of horse races at licensed racing meetings in said State; to render inapplicable certain acts in conflict therewith, and to provide penalties for the violation thereof," hereinafter referred to as the Horse Racing act. The cause is here on writ of error.

On October 30 and November 28 and 29, 1931, James O. Monroe, plaintiff in error, held race meetings where horses raced for a stake, purse or reward in an enclosure in Madison county, and on November 30, 1931, he held an agricultural fair where horses raced for a stake, purse or reward. He made no application for a license to conduct any of the meetings, received no license, paid no license fee, posted no bond and paid no admission tax. In each case he conducted a pari-mutuel or certificate system of wagering on the result of the races, kept as his commission twenty-five per cent of the money wagered, computed the breaks on the basis of five cents on the dollar, conducted some of the races after seven o'clock P. M., conducted some of the races after the last day of October, and in general violated the provisions of the Horse Racing act.

The only issue in the case is the constitutionality of the Horse Racing act. The substance of the act is as follows: Sections 1, 2 and 3 provide for the issuance of licenses by

the Director of Agriculture for the conduct of horse-racing meets. Licenses may be granted only for meetings where horses race for a stake, purse or reward, for no more than fifty-one days in any one year, no licenses to be issued for racing to be conducted before the first day of May or after the last day of October in any year, and license fees to be paid in advance. Section 4 fixes the license fee, and provides that paragraph 41 of section 1, article 5, of "An act to provide for the incorporation of cities and villages," approved April 10, 1872, as amended, shall not apply to licensees. Section 5 levies a tax of twenty cents for each paid admission to inclosures of licensees, for posting of a bond insuring payment of this tax, and provides penalties for failure to make reports required by the Director of Agriculture. Section 6 provides for the distribution of the money received by the Director of Agriculture. Sections 7 and 8 provide penalties for violations of the act. Section 10 legalizes the pari-mutuel or certificate method of wagering at tracks of licensees, limits the use of such system to them and prohibits them from using any other system of wagering, permits retention by the licensees of six and one-half per cent of the money wagered, requires breaks to be computed on the basis of one cent on the dollar and prohibits wagering by minors. Section 11 provides for the inspection of licensees by a representative of the Director of Agriculture, the salary of each inspector to be not more than fifty dollars for each day of racing. Section 12 provides that certain gambling and other statutes are not to apply to licensees and their patrons. Section 13 provides that the act shall not apply to agricultural fairs and limits the use of the pari-mutuel or certificate method of wagering to licensees. Section 14 permits operation of fairs and horse racing on grounds of licensees but prohibits the use of the pari-mutuel or certificate method of wagering in such case. Section 15 provides that the act shall apply only to horse racing.

Plaintiff in error claims that the act is in violation of section 27 of article 4 of the constitution of Illinois, which provides: "The General Assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State." It goes without saying that the pari-mutuel system is not a gift enterprise. In *Dunn* v. *People,* 40 Ill. 465, it was held that the term "lottery" had no technical meaning in the law distinct from its popular signification, and we there accepted a definition quoted by counsel from one of the lexicographers, that a lottery is "a scheme for the distribution of prizes by chance." The same definition was accepted in *Thomas* v. *People,* 59 Ill. 160. Webster's New International Dictionary defines "lottery" as follows: "A scheme for the distribution of prizes by lot or chance, esp. a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them, usually as determined by the numbers on tickets as drawn from a lottery wheel. Three principal forms of lottery have been used: Lotto, or the Genoese or number lottery; the class, or Dutch, lottery; and the interest lottery. In the Genoese lottery (originating about 1530 from a form of political election at Genoa) the player wins by choosing one (simplum), two (ambo), three (terno), four (quaterno), or five (quinto), out of five numbers which draw prizes out of the total of ninety-five tickets drawn. In class lottery (originating early in the sixteenth century in Holland) the tickets are drawn in certain classes or series, for each of which certain prizes are fixed, increasing in number and value with each class. An interest lottery is one that issues bonds for borrowed money at less than the normal rate of interest, giving chances as the consideration for the low interest." The same authority gives many definitions for the word "chance," the only one of which, aside from an allusion to the falling of dice, is "something that befalls as

the result of unknown or unconsidered forces; the issue of uncertain conditions; a fortuity." The same authority defines pari-mutuel as "a form of betting on horses in which those who bet on the winning horse share the total stakes, less a small percentage to the management."

Every event in life and the fulfillment of every lawful contract entered into between parties is contingent to at least some slight extent upon chance. No one would contend, however, that a contract knowingly and understandingly entered into between two parties is a gaming contract merely because its fulfillment was prevented as the result of the befalling of unknown or unconsidered forces, or by the issue of uncertain conditions, or by the result of fortuity. The pari-mutuel system of betting does not come within the definitions given above. While the amount of money to be divided is indefinite as to dollars and cents, it is definite in that the amount of money to be divided is the total stakes on the winning horse, less a given percentage to the management. The persons among whom the money is to be divided are not uncertain, as they are "those who bet on the winning horse." The winning horse is not determined by chance, alone, but the condition, speed and endurance of the horse, aided by the skill and management of the rider or driver, enter into the result. The amount to be paid by a principal to an agent under a contract to be paid ten per cent commission on all sales made by him is dependent in some degree on chance and the happening of many uncertain and contingent events, but the defense that such contract was for such reasons a gambling contract could not be maintained. In our opinion the pari-mutuel system does not come within the constitutional inhibition as to lotteries.

It is contended by plaintiff in error that the act here in question is contrary to the public policy of the State of Illinois. Betting on horse races is not *malum in se* but is only *malum prohibitum*. It is not prohibited by the consti-

tution. The public policy of a State, when not fixed by the constitution, is not unalterable but varies upon any given question with changing legislation thereon, and any action which by legislation, or, in the absence of legislation thereon, by the decisions of the court, has been held contrary to the public policy of the State, is no longer contrary to such public policy when such action is expressly authorized by subsequent legislative enactment. (*People* v. *City of Chicago*, 321 Ill. 466; *Lincoln Park Coal Co.* v. *Wabash Railway Co.* 338 id. 82.) If this act is a valid enactment then it is not contrary to the public policy of this State. (*Landry* v. *Shinner & Co.* 344 Ill. 579.) Whether an act of the legislature is void because it contravenes the public policy of the State depends upon whether the public policy upon the particular subject has been established by statute or is a part of the common law or has been declared by some provision of the State constitution. If it exists merely by virtue of some statute or the common law it may be changed by the legislature at will. *Public Utilities Com.* v. *Romberg*, 275 Ill. 432.

Plaintiff in error claims that the act is in violation of section 22 of article 4 and of section 2 of article 11 of the State constitution in that it grants special privileges and makes arbitrary distinctions and discriminations and unreasonable classifications, and cites in behalf of his contention *Miller* v. *Sincere*, 273 Ill. 194, where the court held invalid a proviso in section 132 of division 1 of the Criminal Code which purported to grant immunity from the provisions of that section to persons entering into gambling transactions, where no delivery of the commodity or security was intended, on "any regular board of trade or commercial or stock exchange" without granting the same immunity to other persons who entered into the same contract under exactly the same circumstances. Boards of trade and stock exchanges are purely private entities not differing in any way as to their rights of contract from any other

private entity and whose acts were not, by the act there in question, subject to the inspection or control of any State agency. In the Horse Racing act the licensees and their conduct of the pari-mutuel are subject to a daily inspection while in operation of racing, by a representative of the Director of Agriculture, whose fees are to be paid by the licensee. The privileges of boards of trade and stock exchanges are limited to the membership of such organizations, which membership is limited by the will of the members. In other words, they are closed corporations. On the other hand, the privileges, as licensees, under the Horse Racing act are open to all who make application for a license and subject themselves to the requirements of the act.

It is claimed that the act is unreasonable in that it discriminates against dog races. There is a great difference between dog racing and horse racing. In dog racing the dogs are turned loose on the race track, without human management or guidance, to run or not to run the race, according to their own will, mood, temperament or instinct and subject to be distracted by circumstances from efforts to win, while in horse racing the horses are subject to human guidance, management and urging to put forth their best efforts to win.

In *Erlanger* v. *Daugherty*, 213 Ky. 648, 281 S. W. 826, (decided in 1926,) the question arose as to whether or not the pari-mutuel statute of Kentucky could apply to wagering on dog races at dog tracks, and the Kentucky Court of Appeals held that even though the language of the statute was broad enough to cover dog racing, yet dog racing was not in existence at the time of the passage of the statute and could not have been contemplated by the legislature in passing the statute, and that, therefore, the statute permitting pari-mutuel betting at tracks on races run at the tracks could not apply to the sale of pools at greyhound race tracks where the dogs were induced to run by means of an

electrical hare, and further held that there would be no discrimination in holding that dog racing did not come within the purview of the statute. That case went to the Supreme Court of the United States on the question of whether or not such a classification was in violation of the fourteenth amendment to the constitution of the United States, and in a per curiam opinion, reported in 275 U. S. 509, the decision of the Kentucky Court of Appeals was affirmed by the United States Supreme Court on the authority of the cases therein cited, the decision being, in effect, that there was no improper or unconstitutional classification in permitting wagering on horse races and forbidding it on dog races.

Our attention is called to the fact that by the provisions of the act licensees are granted privileges denied others not licensed. That naturally follows from the very nature of any license granted by State or municipal authorities. Webster's New International Dictionary defines license as "authority or liberty given to do or forbear any act; permission to do something specified, esp. a formal permission from the proper authorities to perform certain acts or to carry on a certain business which without such permission would be illegal; also the document embodying such permission, as a license to preach, to practice medicine, to sell gunpowder or intoxicating liquors."

From the most primitive times men have been accustomed to bet on horse races, whether legalized or not, and no law has yet been devised to sufficiently curb the evils of unlicensed betting. It is a matter of common knowledge that among those evils has always been that of the "welsher"—i. e., "one who at a race track makes bets or receives money to be bet and absconds without paying his losses or returning the money entrusted to him." (Websters New Int. Dict.) State and county fairs at which horse racing is carried on differ from licensees in that those fairs are supported in whole or in part by public funds and are under the control of public officials. It might well

be that the legislature for ethical reasons saw fit to differentiate such fairs from racing conducted by licensees.

The legislature has a broad discretion in making classifications for police regulation, and the requirement of the constitution that laws shall be general does not mean that every statute shall have effect upon every individual and in every locality. It is for the legislature to determine when the conditions exist calling for the exercise of police power to meet existing evils, and when the legislature has acted the presumption is that the act is a valid exercise of such power. (*People* v. *Stokes,* 281 Ill. 159.) In *People* v. *Cobb,* 343 Ill. 78, where similar questions were raised, it is said: "The distinction singling out fiscal officers is not arbitrary but rests upon good reason of public policy growing out of the conditions created by dishonest fiscal officers of mutual beneficiary societies. The general rule is that classification as determined by the legislature will suffice as a basis for legislation if such classification is based on a rational difference of situation or condition found to exist in the persons or facts upon which the classification rests. (*Greene* v. *Fish Furniture Co.* 272 Ill. 148; *People* v. *Nellis,* 249 id. 12.) A law is general not because it embraces all of the governed but because it may embrace all when they are similarly situated and come within its provisions. (*People* v. *Kaelber,* 253 Ill. 552.) Whether the laws are general or special does not depend upon the number of those who are within the scope of their operation. They are general and uniform not because they operate upon every person in the State, for they do not, but because every person who is brought within the relations and circumstances provided for is affected by the law. (*People* v. *Stitt,* 280 Ill. 553.) The constitutional provision does not mean that the same rule shall apply to every person in the State under all circumstances but only under substantially the same circumstances, and laws may be valid though operating only upon particular persons or classes if there is a valid reason

for such particular operation and a substantial distinction is made.—*Springfield Gas Co.* v. *City of Springfield,* 292 Ill. 236; *Casparis Stone Co.* v. *Industrial Board,* 278 id. 77."

In *People* v. *Walsh,* 346 Ill. 52, it is said: "The first contention is that the act deprives petitioners of liberty and property without due process of law, because its effect is to take away from them the right to practice the profession of chiropractic, which they were practicing at the time of its passage. This contention is not well taken. The right to pursue a lawful calling, business or profession cannot be arbitrarily taken away, but there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the State for the protection of society."

In *Ex parte Tuttle,* 91 Cal. 589, it is said: "Any practice or business the tendency of which, as shown by experience, is to weaken or corrupt the morals of those who follow it or to encourage idleness instead of habits of industry is a legitimate subject for regulation or prohibition by the State, and that gambling in the various modes in which it is practiced is thus demoralizing in its tendencies, and therefore an evil which the law may rightfully suppress without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure, is no longer an open question. The measures needful or appropriate to be taken in the exercise of this police power are determined by legislative policy, and for this purpose a wide discretion is committed to the law-making body. Whether it shall entirely prohibit or only regulate by confining such practices within prescribed limits, whether the law shall apply to every kind of gambling or only to those games or wagers in which evil effects appear with greatest prominence, must be determined primarily by the legislative department of the State or of the municipality authorized to exercise this great power, which is conferred for the purpose of securing the public safety and

welfare, and unless it clearly appears that a statute or ordinance ostensibly enacted for this purpose has no real or substantial relation to these objects, and that the fundamental rights of the citizen are assailed under the guise of a police regulation, the action of that department is conclusive." We also cite *Commonwealth* v. *Kentucky Jockey Club*, 38 S. W. (2d series) 987, (a pari-mutuel case,) where almost all of the questions here involved were raised and discussed.

The point is raised that both the title and the body of the act licensing horse racing and legalizing the pari-mutuel or certificate method of wagering contain two unrelated subjects, in violation of the provision of section 13 of article 4 of the constitution of Illinois that "no act hereafter passed shall embrace more than one subject, and that shall be expressed in the title," rendering the entire act void. The title of the act in question is, "An act to provide for, regulate and license horse racing in the State of Illinois; to legalize and permit the pari-mutuel or certificate method of wagering on the result of horse races at licensed racing meetings in said State; to render inapplicable certain acts in conflict therewith, and to provide penalties for the violation thereof." The word "subject," as used in the constitution, signifies the matter or thing forming the groundwork. It may contain many parts which grow out of it and are germane to it, and which, if traced back, will lead the mind to it as the generic head. (*People* v. *Sargent*, 254 Ill. 514.) It will be seen from the definition of "pari-mutuel" given above that it is not unrelated to horse racing but is related and germane to such racing and such racing alone. The title of an act, under section 13 of article 4 of the constitution, is indispensable. (*Binz* v. *Weber*, 81 Ill. 288.) The object of the provision as to titles in this section is to guard against inconsiderate legislation, to give information as to the subject of legislation with which the act deals, and to prevent joining in one act incongruous or

unrelated matters. (*People* v. *McBride*, 234 Ill. 146; *Riggs* v. *Jennings*, 248 id. 584; *People* v. *Williams*, 309 id. 492.) The object is to require the title of the act to express in general terms its purposes, to prevent surprise by the insertion in the act of provisions not related to its subject and which have no legitimate tendency to accomplish its purposes as expressed in the title. (*People* v. *Stokes, supra; People* v. *Horan*, 293 Ill. 314; *People* v. *Sisk*, 297 id. 314; *People* v. *Jiras*, 340 id. 208.) All matters may be included in an act which are germane to the title and all matters may be included in the title which relate to the same general subject. *People* v. *Emmerson*, 333 Ill. 606.

In *Department of Public Works* v. *Spanogle*, 327 Ill. 122, it is said: "The subject of an act means the matter or thing forming the groundwork of the act, and may include many provisions that are germane to it and are such that if traced back will lead the mind to the subject as the generic head. (*People* v. *Solomon*, 265 Ill. 28; *Perkins* v. *County Comrs.* 271 id. 449.) The general purpose of the constitutional provision is accomplished when a law has but one general subject which is fairly indicated by its title. The title is not required to be an index to or as comprehensive in matters of detail as the body of the act, but if the title fairly indicates the general subject and reasonably covers all the provisions of the act and is not calculated to mislead the General Assembly or the people it is a sufficient compliance with the constitutional requirement. Unless the act contains matters which have no proper connection with or relation to the title, or the title itself contains subjects without any proper relation to each other, the constitutional provision is not violated. The General Assembly must determine for itself how broad and comprehensive the object of the statute shall be and how much particularity shall be employed in the title defining it. An act having a single, general subject indicated in the title may contain many provisions, however diverse, if they are not inconsistent with

or foreign to the subject and may be considered in further-
ance of it by providing for the method and means of ef-
fectuating it. (*People* v. *Stacker,* 322 Ill. 232; *Manaster*
v. *Kioebge,* 257 id. 431; *People* v. *McBride,* 234 id. 146;
*People* v. *Nelson,* 133 id. 565; *Public Service Co.* v. *Reck-
tenwald,* 290 id. 314; *Perkins* v. *County Comrs.* 271 id.
449; *Sutter* v. *People's Gas Light Co.* 284 id. 634.) There
has been a general disposition to construe this constitutional
provision liberally, rather than to embarrass legislation by
a construction whose strictness is unnecessary to the ac-
complishment of the beneficial purposes for which the pro-
vision was adopted."

Plaintiff in error contends that the Horse Racing act
amends other statutes by reference to their titles, only, in
violation of the direction in section 13 of article 4 of the
constitution of Illinois that "no law shall be revived or
amended by reference to its title only, but the law revived,
or the section amended, shall be inserted at length in the
new act," rendering the entire act void. In *People* v.
*Wright,* 70 Ill. 388, it is said: "The language of the con-
stitution on which the second objection is based, is: 'No
law shall be revived or amended by reference to its title
only, but the law revived, or the section amended, shall be
inserted at length in the new act.' No particular section
of any act purports to be amended by this act. All that
can be said of it in this respect is, that by implication it
amends the municipal charters of cities. It cannot be held
that this clause of the constitution embraces every enact-
ment which in any degree, however remotely it may be,
affects the prior law on a given subject, for to so hold
would be to bring about an evil far greater than the one
sought to be obviated by this clause. Our views on this
question are fully and well expressed by the Supreme Court
of Michigan in *People* v. *Mahoney,* 13 Mich. 484. The
court there said: 'If, whenever a new statute is passed,
it is necessary that all prior statutes modified by it by im-

plication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be re-published at every session, and parts of it several times over, until from mere immensity of material it would be impossible to tell what the law was. If because an act establishing a police government modifies the powers and duties of sheriffs, constables, water and sewer commissioners, marshals, mayors and justices and imposes new duties upon the executive and the citizen, it has thereby become necessary to re-enact and re-publish the various laws relating to them as modified, we shall find, before the act is completed, that it not only embraces a larger portion of the laws of the State, but also that it has become obnoxious to the other provisions referred to because embracing a large number of objects but not one of which can be covered by its title. This constitutional provision must receive a reasonable construction with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words or to substitute one phrase for another in an act or section which was only referred to but not re-published was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision and cannot be held to be prohibited by it without violating its plain intent.' "

In *Michaels* v. *Hill*, 328 Ill. 11, it is said: "The purpose of this provision of the constitution is to avoid confusion arising from patchwork legislation but not to re-

quire a practically endless reiteration of amended statutes, and is not to be construed to mean that when a new act is passed all prior acts in any way modified by it shall be published at length in the amendatory act. (*Bishop* v. *Chicago Railways Co.* 303 Ill. 273; *Hollingsworth* v. *Chicago and Carterville Coal Co.* 243 id. 98; *Timm* v. *Harrison,* 109 id. 593.) The test is, if the act under consideration is a complete law in itself, constituting an entire act of legislation on the subject with which it purports to deal, it will be deemed good and not subject to the constitutional prohibition notwithstanding it may repeal by implication or modify the provisions of prior existing laws, but if, on the other hand, the act is merely an attempt to amend the old law on the subject treated, by intermingling new and different provisions with the old or by adding new provisions so as to create out of the existing laws and the new act, when taken together, an act regulating the subject treated, so that the old act must be read with the new in order to determine its provisions concerning a liability, duty or right or in order to give effect to the new act, then the act is clearly amendatory of the old law, and the requirement of the constitution is that the law so amended be inserted at length in the new act. The character of the act in this respect is determined not alone by the title nor whether the act purports to be an amendment of existing laws, but by an examination and comparison of its provisions with the prior law as last in force.—*Bishop* v. *Chicago Railways Co. supra; Board of Education* v. *Haworth,* 274 Ill. 538; *Lyons* v. *Police Pension Board,* 255 id. 139; *Badenoch* v. *City of Chicago,* 222 id. 71; *People* v. *Knopf,* 183 id. 410." This act does not purport to change the language of any prior act but only to withdraw the use of pari-mutuel from the scope of general language used in such prior acts.

By section 16 of the act it is provided: "The invalidity of any section or sections or parts of any section or sections of this act shall not affect the validity of the remainder of

the act." When we apply the rules given above as to the constitutional inhibition with reference to the amendment of statutes, we find that in this case it is immaterial whether or not section 12 of the act be declared invalid. Under these rules the act being complete in itself, section 12 adds nothing to the effect of the act and can take nothing therefrom. If the section be declared valid pari-mutuel is lawful and the statutes and parts of statutes named in the section are of no effect with reference thereto. If the section be declared invalid and eliminated from the act, then by the provisions of the remainder of the act and the rules applicable thereto pari-mutuel is lawful, the statutes and parts of statutes enumerated in section 12 have no longer any application to it, and the same result is attained as if section 12 be held valid.

It is contended by plaintiff in error that the provisions of the act authorizing the requirement of a bond from a licensee delegates legislative power to the Director of Agriculture, an administrative officer, and is therefore void, and *People* v. *Federal Surety Co.* 336 Ill. 472, and other similar cases in support of this contention, are cited. The provision here attacked differs from the one considered in the *Federal Surety Co. case,* in that the provision in the Horse Racing act prescribes the conditions of the bond required while in the provision there declared invalid it did not. Even if this contention were sound and plaintiff in error be conceded to be in a position to raise it, (which is not conceded,) this provision is not an integral part of the act, without which it would not have been enacted, and its invalidity can have no effect on the remainder of the act. *Weksler* v. *Collins,* 317 Ill. 132.

It is claimed that the arbitrary distinctions and discriminations and unreasonable classifications made by the Horse Racing act result in the deprivation of liberty and property without due process of law and deprive those discriminated against of the equal protection of the laws guaranteed by the fourteenth amendment to the constitution of

the United States. In *L'Hote* v. *New Orleans,* 177 U. S.
587, there was at issue an ordinance of the city of New Or-
leans prescribing limitations in that city outside of which
no woman of a lewd character should dwell. The validity
of this ordinance was attacked as violative of the fourteenth
amendment after the Supreme Court of Louisiana had sus-
tained it as a proper exercise of the police power. The
Supreme Court of the United States not only held that the
ordinance was not violative of the fourteenth amendment,
but also sustained the proposition that under the police
power the business in question could either be prohibited,
allowed or regulated, and said: "In this respect we premise
by saying that one of the difficult social problems of the
day is what shall be done in respect to those vocations
which minister to and feed upon human weaknesses, appe-
tites and passions. The management of these vocations
comes directly within the scope of what is known as the
police power. They affect directly the public health and
morals. Their management becomes a matter of growing
importance, especially in our larger cities, where from that
very density of population the things which minister to vice
tend to increase and multiply. It has been often said that
the police power was not by the Federal constitution trans-
ferred to the nation but was reserved to the States, and that
upon them rests the duty of so exercising it as to protect
the public health and morals. While, of course, that power
cannot be exercised by the States in any way to infringe
upon the powers expressly granted to Congress, yet until
there is some invasion of congressional power or of private
rights secured by the constitution of the United States, the
action of the States in this respect is beyond question in
the courts of the nation. In *Barbier* v. *Connolly,* 113 U. S.
27, 31, it was said: 'But neither the amendment, broad
and comprehensive as it is, nor any other amendment, was
designed to interfere with the power of the State sometimes
termed its police power to prescribe regulations to promote

the health, peace, morals, education and good order of the people.' (See, also, *Railroad Co.* v. *Husen,* 95 U. S. 465, *Beer Co.* v. *Massachusetts,* 97 id. 25, *Patterson* v. *Kentucky,* 97 id. 501, *Fertilizing Co.* v. *Hyde Park,* 97 id. 659, *Plumley* v. *Massachusetts,* 155 id. 461, and cases in the opinion.) Obviously, the regulation of houses of ill-fame, legislation in respect to women of loose character, may involve one of three possibilities: First, absolute prohibition; second, full freedom in respect to place, coupled with rules of conduct; or third, a restriction of the location of such houses to certain defined limits. Whatever course of conduct the legislature may adopt is in a general way conclusive upon all courts, State and Federal. It is no part of the judicial function to determine the wisdom or folly of a regulation by the legislative body in respect to matters of a police nature."

In *International Harvester Co.* v. *Missouri,* 234 U. S. 199, it is said: "A classification is not invalid because of simple inequality. We said in *Atchison, Topeka and Santa Fe Railroad Co.* v. *Mathews,* 174 U. S. 96, by Mr. Justice Brewer: 'The very idea of classification is that of inequality, so that it goes without saying that the fact of inequality in no manner determines the matter of constitutionality.' Therefore, it may be, there is restraint of competition in a combination of laborers and in a combination of purchasers, but that does not demonstrate that legislation which does not include either combination is illegal. Whether it would have been better policy to have made such comprehensive classification it is not our province to decide. In other words, whether a combination of wage earners or purchasers of commodities called for repression by law under the conditions in the State was for the legislature of the State to determine."

In *Heath & Milligan Manf. Co.* v. *Warst,* 207 U. S. 338, it is said: "We have declared many times, and illustrated the declaration, that classification must have relation to the

purpose of the legislature. But logical appropriateness of the inclusion or exclusion of objects or persons is not required. A classification may not be merely arbitrary, but necessarily there must be great freedom of discretion, even though it result in 'ill-advised, unequal and oppressive legislation.' (*Mobile County* v. *Kimball*, 102 U. S. 691, 26 L. ed. 238.) And this, necessarily, on account of the complex problems which are presented to the government. Evils must be met as they arise and according to the manner in which they arise. The right remedy may not always be apparent. Any interference, indeed, may be asserted to be evil, may result in evil. At any rate, exact wisdom and nice adaptation of remedies are not required by the fourtenth amendment, nor the crudeness nor the impolicy, nor even the injustice, of State laws redressed by it."

The Supreme Court of the United States, in an opinion handed down May 23, 1932, in *Sproles* v. *Binford*, 76 U. S. (L. ed.) 827, in deciding a case in which the Motor Vehicle act of Texas was assailed on the ground that certain of its provisions violate the due process and equal protection clauses of the fourteenth amendment of the Federal constitution, said: "To make scientific precision a criterion of constitutional power would be to subject the State to an intolerable supervision, hostile to the basic principles of our government and wholly beyond the protection which the general clause of the fourteenth amendment was intended to secure. (*Ohio Oil Co.* v. *Conway*, 281 U. S. 146, 159.) When the subject lies within the police power of the State, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome. (*Standard Oil Co.* v. *Marysville*, 279 U. S. 582, 586; *Price* v. *Illinois*, 238 id. 446, 452, 453; *Hadacheck* v. *Los Angeles*, 239 id. 394, 410; *Euclid* v. *Ambler Co.* 272 id. 365, 388; *Zahn* v. *Board of Public Works*, 274 id. 325,

328.) \* \* \* There is no constitutional requirement that regulation must reach every class to which it might be applied—that the legislature must regulate all or none. (*Silver* v. *Silver,* 280 U. S. 117, 123.) The State is not bound to cover the whole field of possible abuses. (*Patsone* v. *Pennsylvania,* 232 U. S. 138, 144.) The question is whether the classification adopted lacks a rational basis."

Where it is contended that a section of a statute is in contravention of the constitution and it is susceptible of two constructions, one of which would render it constitutional and the other unconstitutional, it is the duty of the court before which the question of its constitutionality is raised to so construe the section as to uphold its constitutionality and validity if the same can be done by any legitimate rule of construction, and if the construction is doubtful the doubt will be resolved in favor of the validity of the law. *Hanover Fire Ins. Co.* v. *Harding,* 327 Ill. 590; *People* v. *Newcom,* 318 id. 188; *People* v. *McBride, supra;* 6 R. C. L. 78.

Numerous cases have been cited in behalf of plaintiff in error's many contentions. It would unduly extend this already lengthy opinion to discuss them in detail. Suffice it to say that we have carefully examined each case cited and very many others bearing on the questions involved, and as a result of our investigation are of the opinion that the Horse Racing act is complete in itself and is a valid enactment, and that the judgment of the county court of Madison county should be, and it is, affirmed.

*Judgment affirmed.*

Mr. JUSTICE DUNN, dissenting.