(No. 2438—

JAMES P. O'KEEFE COMPANY, A CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed February 15, 1939.*

CRAHEN, SULLIVAN, O'TOOLE & SULLIVAN, for claimant.

JOHN E. CASSIDY, Attorney General; JOHN KASSERMAN AND GLENN A. TREVOR, Assistant Attorneys General, for respondent.

MR. JUSTICE LINSCOTT delivered the opinion of the court:

Claimant filed its petition for award in this case on July 19, 1934, in the office of the Clerk of this Court, alleging that it is an Illinois Corporation; that on December 16, 1932, it entered into a contract with the proper Department of the State of Illinois for Grade Separation Pavement Contract No. 5049, and referred to as "State Bond Issue, Route No. 4, Federal Aid Project, Section 430V-X" in Cook County.

A proposal had been made by claimant pursuant to a notice sent out by the Division of Highways to contractors. The notice contained information that sealed proposals for the improvement in question would be received by the Department of Public Works and Buildings at the Division of Highways, Springfield, Illinois, until ten o'clock A. M., October 14, 1932, and at that time publicly opened and read. A description of the work was given in this notice to contractors, and instructions were also given; through the office of the District Engineer, plans for this work were available for office examination only; and plans for this work could be purchased by prospective bidders at the office of the Division of Highways, Springfield, Illinois. This notice also contained information that proposal forms could be obtained from the office of the Division of Highways, Springfield, Illinois, or from the District Engineer, and the Department reserved the right to reject any and all proposals. This notice was dated September 28, 1932 and signed by the Chief Highway Engineer.

Special Provisions were also forwarded to claimant prior to the time of the bid concerning "Standard Specifications for Road and Bridge Construction," adopted January 2, 1932, which govern the construction of State Bond Issue Route No. 4, and also this project, and the claimant was notified that in case of conflict with any part or parts of said specifications, the special provisions should take precedence and should govern.

In the Proposal of the claimant, it was proposed that the plans for the work were to be those prepared by the Chief Highway Engineer and approved by the Director of the Department of Public Works and Buildings on September 28, 1932, which plans are designated as State Bond Issue Route 4, Section 430 V-X Cook County, and which cover the work

described in the proposal. The specifications were to be those prepared by the Department of Public Works and Buildings and designated as "Standard Specifications for Road and Bridge Construction" adopted by it January 2, 1932, with certain amendments specifically set out and of which, claimant had notice.

The contract was dated December 27, 1932, and entered into between The State of Illinois, by the Department of Public Works and Buildings and claimant. The second paragraph thereof provided as follows:

"2. WITNESSETH: That for and in consideration of the payments and agreements mentioned in the proposal hereto attached, to be made and performed by the party of the first part, and according to the terms expressed in the bond referring to these presents, the party of the second part agrees with said party of the first part at his/their own proper cost and expense to do all the work, furnish all materials and all labor necessary to complete the work in accordance with the plans and specifications hereinafter described, and in full compliance with all of the terms of this agreement and the requirements of the engineer under it."

And the third paragraph of said contract provided as follows:

"3. And it is also understood and agreed that the notice to contractors, special provisions, proposal, and contract bond, hereto attached, and the plans for State Bond Issue Route No. 4, Federal Aid Project No. Section 430 V-X, in Cook County, dated September 28, 1932, and the 'Standard Specifications for Road and Bridge Construction,' adopted by the Department January 2, 1932, are all essential documents of this contract and are a part hereof."

The contract was to be performed by the following July 1, 1933.

Claimant contends that subsequent to the execution of the contract and in accordance with the terms and provisions thereof, it began the work and in all respects complied with the terms and provisions of the contract, and all of the work was completed by claimant on July 26, 1933; that prior to the execution of the contract and at the time the bids were submitted in reference to the cost of the work, certain plans and specifications were submitted to the claimant herein by the respondent; that the plan notes and blue prints submitted to the claimant had marked across the face in large type the word "Void" and that other provisions enumerated were obliterated. Claimant further contends that in accordance with the plans and specifications, it submitted its bill for the cost of said work on a unit basis.

Claimant also charges that during the course of the work, rock was encountered, and it became necessary to drill, blast and excavate the rock in the construction of a culvert at Station 498-67, and the expense of excavating this rock in this culvert amounted to $2,695.75.

Claimant also charges that under the terms and provisions of standard specifications for road and bridge construction, namely,—Article 37.2 Construction Methods, it is provided that:

"If solid rock is encountered which is not shown on the plans or mentioned in the special provisions, additional compensation will be allowed therefor as provided herein under 'Basis of Payment.' Solid rock shall include all boulders measuring one-half (½) cubic yard and upwards, and all solid or hard ledge-rock which requires continuous drilling and blasting for economical removal."

It is charged that the plans and specifications submitted to the claimant did not show solid rock would be encountered, and claimant, therefore, asks compensation on the basis of costs plus, and that in view of the fact that the blue prints and other specifications submitted were unintelligible and failed to show that the rock in question was to be removed without cost, by virtue of such facts, claimant is entitled to compensation in the amount above set forth. This part of the contract was completed on February 23, 1933; that the claimant afterwards submitted a bill, but the same has not been paid or any part thereof.

Claimant is also requesting that it be allowed compensation for the reason that the State Department conducting this work had agreed that the Consumers Company was to furnish all material for the fill on this improvement; that agreement was as follows:

"The Consumers Company agree to furnish the fill material for the approaches to the grade separation structure and the State agrees to use the fill so furnished.

"(A) The material is now located on Consumers Company property at McCook, Illinois, and lies adjacent to the rim of the quarry of the Consumers Company at that place.

"(B) The Consumers Company agrees to load free of charge said material on equipment of the State or State's contractor as material is called for, provided reasonable notification is given the Consumers Company when hauling operations are to begin."

It is contended that Consumers Company were given the proper notice but failed and neglected to furnish and load the

necessary material to claimant as called for under the terms of the contract and the delay was caused in part by reason of the fact that the Consumers Company was endeavoring to use old and defective equipment which from time to time became disabled and therefore the claimant was unable to secure the necessary material to proceed with the work; that from December 29, 1932 up until April 11, 1933, the break-down hours amounted to 173 hours; that during this time it was necessary for the claimant to maintain five ton dump trucks and chauffeurs to operate the same, and that the fair, reasonable and customary charge per hour for trucks such as were used by the claimant amounted to $3.82 per hour, or a total charge of $660.86; that a fair, reasonable and customary charge per hour for chauffeurs hire was $1.00 per hour, or $173.00; that it was necessary to expend gas and oil in maintaining the trucks during the 173 hours; that the total cost of the gas and oil was $104.49; that the cost of compensation insurance during said period of time amounted to $10.92, making a total charge of $949.27.

Claimant further contends that all during this time it was ready and willing to carry out its terms of the contract, and that the State has refused to pay this bill.

Claimant also charges that the State failed to furnish cement as agreed under the terms of the original contract, and the claimant having received no notification of any kind from the State that there was to be any delay in the furnishing of the cement, was ready, willing and able to proceed with the execution of the work, and by virtue of the fact that said material was not furnished by the State, it became impossible for the claimant to proceed with said work from May 29, 1933 up to and including June 8, 1933, and claimant charges that the labor and material furnished by claimant during this period of time, caused an expense to this claimant in the sum of $3,307.03, and none of these bills have been paid.

Claimant further charges that there is now due and owing to claimant, the sum of $6,952.05 for labor and materials furnished. ,

We will first determine whether or not claimant, for the reasons alleged in the complaint, is entitled to compensation on account of the rock removed in the construction of the culvert. Plans for the proposed improvement were put in

evidence by claimant. There appears to be fourteen sheets of blue prints. Each page is approximately 23 inches wide and 36 inches long. The index to the sheets on the first page shows that page 2 contains general notes. The right half of this page is set off on white straight lines on a blue back ground in rectangular form. The white lines are twenty inches long and parallel to each other and the end lines are approximately fourteen inches long and parallel to each other. The matters set forth in the page are paragraphed and each paragraph has a word or two showing the title of the paragraph underscored about the center of the page. There are all told on this page, twelve different paragraphs and the third paragraph is marked in white letters one-half inch wide ''Void,'' and that is about the center of the page. It appears that someone has attempted to erase that particular paragraph which is marked ''Void.'' The letters of the word ''Void'' are placed lengthwise to the paragraph and parallel to either of the end lines. The letters of the word ''Void'' do not overlap or appear in any other paragraph. It is a matter of common knowledge that blue prints exposed to strong sun-light will fade in color. These blue prints appear to have had much usage, and it is quite probable they were exposed to strong light.

It also appears from the evidence that the proper State Department in its notice to contractors before the contract was entered into or figured upon, stated that the plans for the work were available for office examination only at the office of the Division of Highways, Springfield, and notice was given where plans could be purchased.

It also appears from Sheet No. 4 on the left hand side of the page, in letters clearly legible, the following:

NOTE: In Constructing the Trench for Laying the Proposed Pipe, *Rock May Be Encountered. See Special Provisions.*

On the right hand side of the page, below the center thereof, appears three lines in letters of white on a blue back ground and clearly legible. Those lines are as follows:

1. Profile of crown of proposed improvement.
2. Profile of existing ground line.
3. Approximate profile of top of rock.

On the extreme right hand side of this sheet, are the datum lines. From each of the lines above mentioned, arrows, con-

sisting of white straight lines with an arrow on the end, directly connect each of the lines to the place which the line describes, and an index of this particular sheet is in the upper left hand corner of the first page, and is as follows:

Sheet No. 4 Plan & Profile Station 483 + 00 to Station 503 + 00.

Mr. James P. O'Keefe, President of plaintiff corporation, testified as follows: (Page 25 of the transcript.)

Q. Prior to the time that you entered into this contract, will you tell us briefly, what, if anything, was done?

A. Before we got the contract we went out and looked it over and when the bids were being sent in, we sent our bid in. We check the plans and—there was a quantity of rock in there, but—

Q. Before we go into that, Mr. O'Keefe, did you receive any communication from the State of Illinois, prior to the time you signed the contract, no notice—

A. We received notice that they would be letting on different jobs; that was the only job we bid in for.

On page 2 of the plans, (one of the paragraphs of which claimant testified that he took for granted were void), was the following with the headline underscored:

*"Excavating For Culvert.*

"Rock may be encountered in extending the existing culvert. If rock is encountered no extra compensation will be allowed."

No where in the evidence does it appear that any misrepresentations were made to claimant concerning the rock or any effort of any kind made to mislead claimant. It appears from Mr. O'Keefe's own testimony:

A. Before we got the contract we went out and looked it over and when the bids were being sent in, we sent our bid in. We checked the plans and—there was a quantity of rock in there, but—

The plans and specifications were made a part of the contract, and the "Standard Specifications" were a part of the contract. This consists of a book of 368 pages. Under these circumstances, we feel that claimant is estopped from now making a claim for extra compensation on account of the rock, and public policy would deny claimant any rights

for additional compensation for the reasons hereinbefore set forth.

"A party proposing the terms of a contract cannot be heard to object to them."

*Faunce* vs. *Burke*, 16 Pa. St. 469.

"In the absence of fraud or misrepresentations, when a party has executed a written contract, he is estopped to deny its terms.

"If a party to a contract had any objections to the provisions of a contract he signed, he should have refused to make it. Having executed it, his mouth is closed against any denial that it superseded all previous arrangements."

*Parish* vs. *United States*, 8 Wall. 489, 19 U. S. (L. ed.) 472.

The word "Void" over the third paragraph on page 2 of the plans, clearly only applied to that paragraph. Nothing appears in the record that would lead claimant to assume that the word "Void" as appeared on page 2 invalidated that whole page and all paragraphs thereon contained. Particulary is this true when one considers the reference made to rock on page 4, which showed a profile of the part of the improvement known as the culvert, and the Standard Specifications which provides that rock may be encountered in extending the existing culvert, and if rock is encountered, no extra compensation will be allowed. We, therefore, hold that claimant is not entitled to this part of the claim.

It is next urged that claimant is entitled to compensation because the Consumers Company did not carry out its agreement to load free of charge, either material or equipment of the State or State's contractor as material is called for, provided reasonable notification is given the Consumers Company when hauling operations are to begin. This company was to furnish the "fill" for the improvement and did advise claimant that the Consumers Company would load the material as called for, apparently meaning to put the filling material in the trucks of the State or the contractor, after having received notice. Due notice was given, but no limit was placed upon the number of trucks that were to be used in hauling the fill. When claimant entered into the contract with the State, it had notice of what the Consumers Company was to do by way of furnishing this fill, but the Consumers Company undertaking is quite vague and indefinite. No where does it appear that there was any consideration given to the State or that the State paid any consideration for

the fill. No where does it appear that claimant ever discussed with the Consumers Company what means they were to use in loading this material, or the amount to be loaded in one day, but it is clear that if there is any default on behalf of the Consumers Company, claimant should look to it for reimbursement. The Consumers Company had agreed to load this material either for the State or its contractor at a place adjacent to the rim of the quarry of the Consumers Company.

The law is settled in this state that if a contract is entered into for the direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct he may sue on the contract; if incidental he has no right of recovery thereon. This rule has been announced without variation in numerous cases decided by the Supreme Court of Illinois. See *Carson Pirie Scott & Co.* vs. *Parrett,* 346 Ill. 252, and cases therein cited.

Compensation to claimant on this contention will, therefore, be denied.

Lastly, the claimant requests compensation because it was delayed eleven days on account of the failure of the State Department to furnish cement as provided in the contract. The contract required that claimant should fully perform his contract by July 1, 1933. It did not fully perform its contract for twenty-five days thereafter, or until July 26, 1933, so claimant was in default.

Mr. Hoehl testified for claimant and he was asked these questions and made the following answers: (Transcript 46.)

Q. Did any information come to you before you began paving the highway, Mr. Hoehl, that the State might not be able to furnish the cement?

A. No.

Q. No word came to your Company?

A. As far as I know, no information reached us.

Q. As far as your own information goes, then there was never any trouble between the Cement Companies and the State of Illinois, about furnishing cement, is that right?

A. Yes. I mentioned that before.

Engineer Holloway testified for the State (Transcript 61) that various times before claimant was ready to do any

paving· on this job he had had conversations concerning the furnishing of cement; that he talked to Mr. O'Keefe and Mr. Hoehle; that he had been informed by the proper department that there would be a delay in furnishing cement.

A letter was sent to claimant under date of May 5, 1933, and is known as Respondent's Exhibit No. 1. That letter is as follows:

"As you undoubtedly are aware by this time, the State is having some difficulty in furnishing cement for the work for which you have a contract. We do not know at this time just when this situation will be cleared up.

"The purpose of this letter is to caution you regarding starting any new work or operations which will require cement, until such time as the cement situation is definitely cleared up. As soon as we have knowledge that cement will be available we will so inform you.

Yours very truly,

KENDRICK HARGER,

Acting District Engineer."

Neither of the parties to this contract contemplated that the State should furnish any cement for claimant immediately after the contract was entered into, which was in the month of December, 1932. It was well known that the claimant did not need cement at that time of the year or for sometime thereafter and until many other things were done. The fill for this overhead had to be made and properly packed. It appears that Utilities Companies, such as the Telephone Company, had certain rights which had to be respected. The evidence shows that the first cement was furnished during the first week of June, 1933. The evidence also conclusively shows· that the telephone Company was installing cables over this improvement which they had a. right to do under the contract, and that other work was being done by the claimant on this improvement up to about that time. No where does it appear that claimant was delayed in removing its machinery to another job or was delayed in another job by reason of the failure of the State to furnish cement. The evidence does show that the claimant placed its concrete mixer and other paving appliances on the job on May 29, 1933, four days after it had notice from the State that there would be a delay in furnishing cement. It was a matter of common knowledge that the cement producers were demanding exorbitant prices from the State for cement. The people of the .State of Illinois were vitally interested. It might well be assumed that

cement manufacturers knew that the State had agreed to furnish cement to numerous contractors and that contracts were then in existence for public improvements which the State had entered into. It also might well be assumed that the public officials of the State of Illinois, through its Chief Executive, the Governor of the State of Illinois, rightfully felt that the action of the cement manufacturers or dealers was such as to make those public improvements so costly as to be prohibitive and against public policy.

The meaning of the phrase "public policy" is vague and variable; courts have not exactly defined it, and there is no fixed rule by which to determine what contracts are repugnant to it. It is impossible to define with accuracy what is meant by that public policy for an interference and violation of which a contract may be declared invalid. It may be understood in general that contracts which are detrimental to the interests of the public as understood at the time fall within the ban.

> *Pope Mfg. Co.* vs. *Gormully,* 144 U. S. 224, 36 L. ed. 414.

Courts have however, frequently approved Lord Brougham's definition of public policy as the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare. This principle, it has been said may be termed "policy of the law or the public policy in relation to the administration of the law."

> *People* vs. *Monroe,* 349 Ill. 270; *People ex rel. Peabody* vs. *Chicago Gas Trust Co.* 130 Ill. 268.

The question what is public policy in a given case is as broad as the question what is fraud in a given case and is addressed to the good common sense of the court. The relations of society become from time to time more complex. Statutes defining and declaring public and private rights multiply rapidly. Public policy often changes as the laws change, and therefore new applications of old principles are required.

> *Wakefield* vs. *Van Tassell,* 202 Ill. 41.

The exorbitant price demanded by cement manufacturers effected the whole State of Illinois, and it must be conceded that such action was injurious to the public. This claim for

damages arising from the fact that the State could not furnish cement must be denied on the grounds of public policy.

It may be contended that in repudiating any liability on behalf of the State for its failure to furnish cement under the circumstances in this case is an unconscionable act. The answer to this is that in a situation of this kind the interest of the public, rather than the equitable standing of individual parties, is of determining importance, and we base our opinion upon principles of public policy and to conserve the public welfare.

Assuming for the sake of the argument that everything was in readiness for claimant to use cement. No paving was laid for the reason that the State did not furnish cement for that purpose. The State, through its Chief Executive, was objecting to the exorbitant prices that cement manufacturers were attempting to charge the State. Owing to the unusual situation in this regard, the press of the State, as news items, daily reported the controversy, which lasted some considerable time, and the subject was much discussed privately, but it is said that the State entered into this contract with claimant and agreed to furnish the cement when claimant was ready. The question is: Should the State be held to the same rules as any private party entering into a contract of this kind?

In the case of *United States* vs. *Warran Transportation Company,* 7 Fed. (2d) 161, in discussing a similar feature, the court said: "When the United States is a party litigant it assumes one of two characters; it may appear in the character of a sovereign or in the character of contractor." Continuing, the court held: "It follows, therefore, that when the United States appears as a contractor, it cannot be held liable for an obstruction to the performance of its contract resulting from its public and general acts as sovereign, whether legislative or executive." The court cited numerous authorities.

The Supreme Court of the United States in the case of *Horowitz* vs. *United States,* 267 U. S. 458, 69 L. Ed. 736, dismissed the petition, on demurrer, for failure to state a cause of action. On December 20, 1919, the claimant submitted a bid for certain silk, and at that time an agreement was made that the claimant would be given an opportunity to resell the silk before completing the payment of the purchase price, and

that the "departments of the government having jurisdiction in matters of this kind" would ship the silk, which was then in Washington, within a day or two after shipping instructions were given. On December 22, claimant was notified by the Board that the sale of the silk to him had been "approved" and claimant thereupon paid part of the purchase price, and on January 30, 1920, he sold the silk to a silk company in New York. On February 16, he paid the balance of the purchase price and wrote the board to ship the silk at once, by freight, to the silk company. Two days later, claimant was notified by the board that it had received the shipping instructions and had ordered the silk to be shipped. Thereafter the price of silk declined greatly in New York market, until March 4. On that date the claimant learned that the silk was still in Washington, and had not been shipped because the government, through one of its agencies, the United States Railroad Administration, had, prior to March 1, 1920, placed an embargo on shipments of silk by freight and that the shipment of silk for claimant had been held up. Afterwards, the government shipped the silk to the consignee, by express. It arrived in New York on or about March 12. The consignee then refused to accept delivery on account of the fall in the prices. And "by reason of the government's breach of the contract and agreement in placing an embargo, and failing to ship the silk either by express or freight prior to March 4, 1920, the price of silk having declined, the claimant was forced to sell the said silk for $10,811.84 less than the price the consignee had agreed to pay for same had it been delivered in time." The petition alleges that the claimant is entitled to recover from the United States the said sum of $10,811.84, "for and on account of the violation of the said agreement" and prayed judgment. The court affirmed the Court of Claims and held that the United States, when sued as a contractor, cannot be held liable for an obstruction to the performance of a particular contract, resulting from its public and general acts as a sovereign. *Deming* vs. *United States,* 1 Ct. Claims, 190, 191; *Jones* vs. *United States,* 1 Ct. Claims, 383; *Wilson* vs. *United States,* 11 Ct. Claims, 513.

In the Jones Case, 1 Ct. Claims, 383, the court said: "The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the

United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants."

By a parity of reasoning, the same rules would apply to the State of Illinois acting in its sovereign capacity.

The action of the State Highway Department in denying these claims is held to be proper, and the claims will, therefore, be denied.