(No. 26103.—

CHARLES H. ALBERS, Receiver, (OTTO C. WOERTER, Successor,) *et al.,* Appellees, *vs.* W. A. LAMSON *et al.*— (W. A. LAMSON *et al.,* Appellants.)

*Opinion filed June 11, 1942.*

MOSES, KENNEDY, STEIN & BACHRACH, and McGRATH & COPELAND, (WALTER BACHRACH, and WALTER H. MOSES, of counsel,) for appellants.

FREDERICK V. ARBER, GEORGE Z. BARNES, and CLYDE R. BIRKETT, for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

The plaintiff, Charles H. Albers, as receiver of Roanoke State Bank, recovered a judgment in the sum of $95,632.29 in the circuit court of Peoria county against the appellants, W. A. Lamson and others, a copartnership doing business as Lamson Bros. & Co. A direct appeal has been taken to this court because a constitutional question is involved.

The facts, for the most part, are stipulated and are briefly as follows: Lamson Bros. & Co. is a brokerage firm having offices in about 27 cities throughout the United States, one of which was in Peoria. This partnership is now, and for many years has been, a member of the principal national security exchanges engaged in the usual line of brokerage business in stocks, bonds, grain and various commodities. On August 18, 1936, one Benjamin R. Belsley opened an account with the Lamson firm at its Peoria office and began trading in stocks and grain futures. He was introduced to that firm as a retired farmer of substantial means and a high reputation for integrity. When the account was opened he executed the usual customer's agreement, the terms of which are unimportant for the purposes of this opinion.

His early transactions appear to have been small and unimportant and were confined to "bids" in connection with the purchase and sale of grain for future delivery. At the time of the commencement of these dealings, Belsley was, and, until his suicide, continued to be president of Roanoke State Bank, located at Roanoke, Illinois, a small village not far from Peoria. This bank appears to have kept its bonds and other securities in a safety deposit box in Peoria, which was either under the exclusive control of Belsley, or to which he had access. In 1936, Belsley began extensive trading in grains and stocks which he financed by abstracting bonds from the safety deposit box of the Roanoke State Bank and depositing them with Lamson Bros. & Co. to margin his account. The total amount

of collateral so deposited at one time ran up to $124,500. His tradings were extensive. In 1937, alone, he bought and sold grain futures to the extent of nearly a million bushels and in value well over a million dollars. During the same time, the transactions in stocks amounted to many thousands of shares. The net result of all these transactions was a loss so large that it wiped out Belsley's margin and apparently caused him to commit suicide.

To protect itself and cover these losses, Lamson Bros. & Co. sold all of the securities which had been deposited with it, and which Belsley had misappropriated from the assets of the Roanoke State Bank. This suit was brought for the recovery of the value of the securities wrongfully converted by Belsley and pledged with Lamson Bros. & Co. on a theory that all of his dealings with that partnership were gambling transactions; that Lamson Bros. & Co. knew the securities belonged to the bank and not to Belsley, but that, in any event, whether they knew it or not, they were liable to account for the value of the bonds because of the gambling nature of the transactions under the provisions of section 132 of the Criminal Code. Ill. Rev. Stat. 1941, chap. 38, par. 330.

The circuit court made extensive findings of fact which are fully sustained by the stipulation and the evidence, and which this court accepts as true. Among such findings, in addition to those stated above, are that Lamson Bros. & Co. had neither knowledge nor notice of any ownership or claim thereof in any of the securities in any person other than the deceased; that all of the transactions were accepted by the defendants for transmission to and were regularly carried out on regular boards of trade or regular stock exchanges; that the defendants actually took delivery of all securities purchased by them for Belsley's account, and made delivery of all securities sold by them for Belsley's account; that all grain transactions were closed by counter transactions, rather than actual deliveries, and that

the defendants at all times acted as Belsley's agents. It was further found that the account was at all times adequately margined in accordance with the rules of the various exchanges, and those provided by the Commodity Exchange Commission.

The circuit court held that all of the dealings in question were gambling transactions and that the plaintiff was entitled to recover. This holding was based upon a decision of this court made 25 years ago concerning the section of the Criminal Code above mentioned. The case which the circuit court followed was *Miller* v. *Sincere*, 273 Ill. 194. In that case this court held the last sentence of section 132, above referred to, to be unconstitutional and void. That sentence is as follows: "No person who accepts from another person for transmission, and transmits, either in his own name, or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person on, any regular board of trade or commercial or stock exchange, shall, under any circumstances, be deemed a 'winner' of any moneys lost by such other person in or through any such transactions." In deciding the *Miller case* reference was made to previous decisions of this court under which it had been held that dealings in futures were to be considered as gambling transactions and it was pointed out that the amendment of 1913 to section 132, *supra,* did not attempt to exempt all agents or brokers, but only those who executed orders upon a regular board of trade or commercial stock exchange. It was pointed out that a broker who dealt on the street or any other place not connected with such a board of trade or stock exchange would still be deemed a winner and liable for losses incurred. The amendment of 1913 was held void as being discriminatory between individuals and classes. It was said there was no sufficient reason why a difference should be made between one who was and one who was not a member of a board of trade, the one being exempt and the other subjected to liability for doing the same thing.

A reference to the opinion in the *Miller case* is appropriate, but it is unnecessary here to review and repeat all that we said there. It is enough to point out that the circuit court was entirely right in its judgment if that case stands and remains the law of Illinois. Our question for decision is whether or not subsequent enactments and later decisions of this court when considered together with national public policy as declared by Congress require a modification of, or departure from, all or some of the things said in that opinion.

In the recent case of *Iris Amusement Corp.* v. *Kelly*, 366 Ill. 256, we gave attention to the legislative power to legalize gambling and took note of the fact that the only constitutional restriction on the part of the legislature in that behalf was that provision of section 27 of article IV, which prohibits the General Assembly from authorizing lotteries or gift enterprises. There is no contention that the amendment here called in question for the second time could be classified as applying to lotteries and we are only concerned with deciding whether or not these gambling transactions were constitutionally authorized by valid legislative enactment. It is argued in the briefs that the reenactment of this section in 1935, subsequent to our decision in the *Miller case,* is of some significance, but we do not think it is. The reenactment in 1935 in so far as it applies to this section of the act, was only one of a very large number of reenactments by that session of the legislature to make existing laws comply with the then new Practice act.

Since our decision in the *Miller case* at least two very significant changes in our public policy, both State and national, have taken place. In 1927 the legislature passed the so-called Horse Racing act, which legalized pari-mutuel betting (Ill. Rev. Stat. 1941, chap. 8, sec. 37a, *et seq.*) and the validity of this act came before this court for determination in *People* v. *Monroe*, 349 Ill. 270. After holding that the act in question did not provide for a lottery as defined by the constitutional inhibition, its provisions were

sustained, and inasmuch as the case of *Miller* v. *Sincere, supra,* is discussed in the opinion it is well to repeat a part of what we then said:

"It is contended by plaintiff in error that the act here in question is contrary to the public policy of the State of Illinois. Betting on horse races is not *malum in se* but is only *malum prohibitum.* It is not prohibited by the constitution. The public policy of a State, when not fixed by the constitution, is not unalterable but varies upon any given question with changing legislation thereon, and any action which by legislation, or, in the absence of legislation thereon, by the decisions of the court, has been held contrary to the public policy of the State, is no longer contrary to such public policy when such action is expressly authorized by subsequent legislative enactment. (*People* v. *City of Chicago,* 321 Ill. 466; *Lincoln Park Coal Co.* v. *Wabash Railway Co.* 338 id. 82.) If this act is a valid enactment then it is not contrary to the public policy of this State. (*Landry* v. *Shinner & Co.* 344 Ill. 579.) Whether an act of the legislature is void because it contravenes the public policy of the State depends upon whether the public policy upon the particular subject has been established by statute or is a part of the common law or has been declared by some provision of the State constitution. If it exists merely by virtue of some statute or the common law it may be changed by the legislature at will. *Public Utilities Com.* v. *Romberg,* 275 Ill. 432.

"Plaintiff in error claims that the act is in violation of section 22 of article IV and of section 2 of article XI of the State constitution in that it grants special privileges and makes arbitrary distinctions and discriminations and unreasonable classifications, and cites in behalf of his contention *Miller* v. *Sincere,* 273 Ill. 194, where the court held invalid a proviso in section 132 of division 1 of the Criminal Code which purported to grant immunity from the provisions of that section to persons entering into gambling

transactions, where no delivery of the commodity or security was intended, on 'any regular board of trade or commercial or stock exchange' without granting the same immunity to other persons who entered into the same contract under exactly the same circumstances. Boards of trade and stock exchanges are purely private entities not differing in any way as to their rights of contract from any other private entity and whose acts were not, by the act there in question, subject to the inspection or control of any State agency. In the Horse Racing act the licensees and their conduct of the pari-mutuel are subject to a daily inspection while in operation of racing, by a representative of the Director of Agriculture, whose fees are to be paid by the licensee. The privileges of boards of trade and stock exchanges are limited to the membership of such organizations, which membership is limited by the will of the members. In other words, they are closed corporations. On the other hand, the privileges, as licensees, under the Horse Racing act are open to all who make application for a license and subject themselves to the requirement of the act."

After this decision the Congress of the United States found it appropriate to further define national public policy in that field of interstate commerce wherein the Federal government is supreme. In 1934 a comprehensive act was passed known as "Securities Exchange Act of 1934." (U.S.C.A. Tit. 15 78a *et seq.*) This act followed the Securities act of 1933. (U.S.C.A. Tit. 15 77a *et seq.*) There was also enacted by Congress the Commodity Exchange act. (U.S.C.A. Tit. 7, sec 1 *et seq.*) There have also been other acts of Congress which might be pertinent, but none of the details of any of them is essential to this decision. They are mentioned only for the one purpose of pointing out that the Congress has exercised its constitutional power to regulate interstate commerce, in which field it has unquestioned supreme control. That the Securities and Exchange

Commissions, the boards of trade and other similar instrumentalities are engaged in interstate commerce is not a debatable question.

So far as this opinion is concerned these citations are only for the purpose of pointing out that a valid constitutional agency, *i.e.*, the Congress of the United .States, has provided such a system of regulation and control over dealings in stocks, bonds, grain, etc., as to regulate the conduct of those .agencies in the public welfare within all of the requirements laid down by this court, wherein we held it legal to bet on horse races within proper supervision. (*People* v. *Monroe, supra.*) The situation as to boards of trade and stock exchanges has been materially changed since the decision of the court in the *Miller case, supra,* and it can no longer be said, as was said in the *Monroe case,* referring to the *Miller case,* that they are "purely private entities not differing in any way as to their rights of contract from any other private entity and whose acts were not, by the act there in question, subject to ·the inspection or control of any State agency." On the contrary, these exchanges have been subjected to the most minute control of their every act and that control is imposed by the highest legislative authority. By this opinion we are not deciding or even conceding that the Congress has any power to determine what the criminal law of Illinois shall be, but we are deciding and conceding that the Congress in its control of interstate commerce is supreme and that we have neither power nor right to decide whether or not it may or should either authorize or prohibit the making of contracts for future deliveries, either of securities or any commodity. It is enough to say here that Congress has assumed control of these exchanges, and that nothing has been shown by this record to invalidate any contract now under consideration.

Our decision in *Miller* v. *Sincere, supra,* thwarted an obvious legislative intent to permit dealings in futures. This court at that time evidently realized what is commonly known, *i.e.,* that these contracts are frequently used

as gambling transactions and that at that time gambling in general was regarded as contrary to the public policy of this State. The Horse Racing act has made it clear that that public policy is no longer in existence and this court has sustained the Legislature's prerogative in so declaring. The titles to the various acts of Congress make it clear that our public policy now recognizes the desirability and necessity of maintaining open markets, even if they sometimes be used for gambling, in order to stabilize values in commodities and securities. As briefly mentioned in the *Monroe case,* every human transaction is a gamble, which all must take whether they wish to or not. From the time he plants his seed until he sells his crop, every farmer is gambling. From the time he makes a contract of sale until he delivers the flour, every miller is gambling. The public policy has been declared to be that these contracts for future delivery are necessary to the commerce of the people of the United States in their domestic interstate economy, and since no one can tell with what intent they are entered into, it is impossible to pick and choose among them.

From a survey of a period of years we think it clear that the legislature of this State has always intended to validate contracts such as those here in question; that the valid acts of Congress have provided such regulatory and supervisory means of control as to bring these stock exchanges and boards of trade within the rules laid down in *People* v. *Monroe, supra,* concerning bets on horse races. It is our conclusion that during the quarter of a century since the decision of *Miller* v. *Sincere, supra,* the State and national public policy has so changed as to make the decision in that case no longer applicable or binding in a record such as the one now before us. It follows as a matter of course that the decree of the circuit court of Peoria county must be reversed as to appellants and that no other assignments of error need be considered.

*Decree reversed.*