GLORIA MOUSHON, Plaintiff-Appellee, v. AAA AMUSEMENT, INC., *et al.*, Defendants-Appellants (Chuck McMasters, Plaintiff; Fleetwood Restaurant, Inc., *et al.*, Defendants).

Fourth District    No. 4—93—0971

Opinion filed April 29, 1994.—Modified on denial of rehearing November 3, 1994.

David K. Anderson (argued), of Riverton, for appellants.

Kevin L. Halligan (argued), of Delano Law Offices, P.C., of Springfield, for appellee.

JUSTICE GREEN delivered the opinion of the court:

This case concerns section 28—8 of the Criminal Code of 1961 (Code) (720 ILCS 5/28—8 (West 1992)), which provides a cause of action for treble damages to the loser of certain illegal bets against the winner of the bets. On January 31, 1992, plaintiffs Gloria Moushon and Chuck McMasters brought this action in the circuit court of Sangamon County against defendants Fleetwood Restaurant, Inc., AAA Amusement, Inc. (AAA), Allstar Music, Inc., Illinois Tap, Inc., and Chuck and Linda Frank, d/b/a Linda's Place. Plaintiffs alleged in an amended complaint they had been patrons of a tavern called Linda's Place, the Fleetwood Restaurant (Fleetwood), and a tavern known as Illinois Tap, on various occasions between August 1, 1991, and January 15, 1992, Gloria had put money in various gambling machines at those locations and had lost various sums of money while gambling with those machines. They sought to recover under section 28—8 of the Code for those losses.

The charges against Illinois Tap and Allstar Music were brought only by McMasters and were dismissed before trial, as were the charges against Fleetwood. On July 27, 1995, following a jury trial, judgment was entered on a jury verdict in favor of Moushon and against Chuck Frank and Linda Frank in the sum of $1,252.

The Franks have appealed, maintaining (1) article 28 of the Code (720 ILCS 5/28—1 through 28—9 (West 1992)) violates Federal and State constitutional provisions; (2) the evidence did not support the verdict; (3) the circuit court erred in instructing the jury on the damages and in communicating with the jury in that respect; and (4) plaintiff and her "co-conspirator" have perpetrated a fraud on the Franks and the court. We affirm.

The constitutional question involves both the equal protection clause of the fourteenth amendment (U.S. Const., amend. XIV) and the special legislation prohibition of the Illinois Constitution of 1970 which states, in part, that "[t]he General Assembly shall pass no special or local law when a general law is or can be made applicable." (Ill. Const. 1970, art. IV, § 13.) The first statutory provision we must consider is section 28—8 of the Code, which states in full as follows:

> "Gambling Losses Recoverable. (a) Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action

against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a 'winner' of any moneys lost by such other person in or through any such transactions.

(b) If within 6 months, such person who under the terms of Subsection 28—8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy, any person may initiate a civil action against the winner. The court or the jury, as the case may be, shall determine the amount of the loss. After such determination, the court shall enter a judgment of triple the amount so determined." 720 ILCS 5/28—8 (West 1992).

Section 28—1(a) of the Code (720 ILCS 5/28—1(a) (West 1992)) sets forth a very comprehensive list of transactions which constitute "gambling." Section 28—1(b) then states that "[p]articipants in any of the following activities shall not be convicted of gambling therefor." (720 ILCS 5/28—1(b) (West 1992).) The immunized activities include certain contests and legislatively authorized pari-mutuel betting, bingo, lotteries, raffles, charitable games, "[p]ull tabs," "jar games," and riverboat gambling. (720 ILCS 5/28—1(b)(2), (b)(3), (b)(5), (b)(6), (b)(8), (b)(9), (b)(10), (b)(11) (West 1992).) Section 28—1(c) of the Code (720 ILCS 5/28—1(c) (West 1992)) makes various types of gambling prohibited under this section a Class A misdemeanor, and a subsequent conviction a Class 4 felony.

█ The thrust of the Franks' contention that section 28—8 of the Code fails to meet constitutional requirements is that the exemptions granted by various amendments to section 28—1(b) of the Code, which also creates exemptions from section 28—8 of the Code, violate the equal protection clause and create special legislation in violation of the Illinois Constitution of 1970. The Franks maintain that the amendments, without rational basis, create causes of action for repayment of certain types of gambling losses but not other types. Where legislation classifies people who commit certain types of conduct, both the equal protection clause and the special legislation prohibition usually only require that the classification have a rational basis. *Nordlinger v. Hahn* (1992), 505 U.S. 1, 11-12, 120 L. Ed. 2d 1, 13, 112 S. Ct. 2326, 2332; *People ex rel. County of Du Page v. Smith* (1961), 21 Ill. 2d 572, 578, 173 N.E.2d 485, 489.

In contending no rational basis exists here, the Franks cite *Miller v. Sincere* (1916), 273 Ill. 194, 112 N.E. 664. There, an action was

brought pursuant to section 132 of the Criminal Code (Hurd's Stat. 1913, at 832), which, like section 28—8 of the Code, provided for a loser at gambling to be compensated for the loss by the winner. Section 132 was deemed to include as gambling the sale of grain or other commodity or corporate stock futures when the actual taking possession of the item involved was not intended. In 1913, an amendment to section 132 of the Criminal Code was passed which, somewhat similarly to section 28—1(b) of the Code, exempted from coverage under section 132 transactions for the sale of futures when made through "any regular board of trade or commercial or stock exchange." (1913 Ill. Laws 256, 257.) The circuit court dismissed the complaint upon a plea by the defendant that the transaction involved was a future sale on the Chicago Board of Trade and exempt under the amendment.

The *Miller* court held that the 1913 amendment to section 132 of the Criminal Code violated both the equal protection clause and the then special legislation provision of the Illinois Constitution of 1870. (Ill. Const. 1870, art. IV, § 22.) The rationale of the decision was that the amendment gave special privileges to "regular" board of trade or commercial or stock exchanges over persons operating "on the street, or any other place" (*Miller*, 273 Ill. at 199, 112 N.E. at 665) without a reasonable basis for the distinction. (*Miller*, 273 Ill. at 199-200, 112 N.E. at 666.) The supreme court then reversed and remanded to the circuit court for further proceedings.

Notably, the *Miller* court did not hold the portion of the gambling legislation which provided for compensation for losses invalid, as the Franks request here. That court found the provisions for exemptions were invalid because they lacked a rational basis. A similar holding would be of no aid to the Franks here. However, we conclude that precedent subsequent to *Miller* indicates that the entire format of article 28 of the Code is consistent with the due process clause and article IV, section 13, of the Illinois Constitution of 1970.

In *People v. Monroe* (1932), 349 Ill. 270, 182 N.E. 439, a person was convicted in a trial court of a violation of "An Act to provide for, regulate and license horse racing ***" (Horse Racing Act) (Ill. Rev. Stat. 1931, ch. 8, par. 37a *et seq.*), which purported to regulate the licensing and holding of horse racing, and legalizing and permitting pari-mutuel betting at such races. On appeal to the supreme court, that defendant maintained that the legislation violated the State constitution in various ways, but all those contentions were rejected. One such claim was that, as in *Miller*, the legislation contained unreasonable classifications. The *Monroe* opinion responded by explaining that the licenses for pari-mutuel betting were inspected

daily and were highly regulated. The court also noted that horse racing, where betting was permitted, differed from dog racing, where betting was not permitted, because the horses are guided by jockeys while the dogs run free. *Monroe*, 349 Ill. at 277, 182 N.E. at 442-43.

Unlike the *Miller* court's description of the activities involved there as not being a legitimate transaction, the *Monroe* court described "[b]etting on horse races" as "not *malum in se*, but *** only *malum prohibitum*." (*Monroe*, 349 Ill. at 275, 182 N.E. at 442.) The court then explained that in view of legislation authorizing such betting, it could no longer be considered contrary to public policy.

In *Albers v. Lamson* (1942), 380 Ill. 35, 42 N.E.2d 627, a receiver of a bank recovered a judgment of $95,632 in the circuit court against a brokerage firm under section 132 of the then Criminal Code (Ill. Rev. Stat. 1941, ch. 38, par. 330) for sums lost by a former president of the bank while speculating in grain futures through the defendant brokerage firm with assets of the bank. At that time, the amendment to section 132 declared unconstitutional in *Miller* had been reenacted. If valid, it would have legitimized the gambling aspects of the bank president's activity, but the circuit court ruled it was invalid, apparently on the basis of *Miller*.

The *Albers* court reversed, stating that two changes in public policy had taken place since *Miller*. One was the upholding of the Horse Racing Act in *Monroe*, which upheld some types of betting. The other was the passage of the Securities Exchange Act of 1934 (see 15 U.S.C. § 78a *et seq.* (1988)) and the Commodity Exchange Act (see 7 U.S.C. § 1 *et seq.* (1988)), which together regulated trading in stocks and bonds and also grain and other commodities, and recognized the need for trading in futures as a hedge. The opinion focused upon the change in public policy which would permit legislative authorization of some types of activity previously deemed to be illegal gambling. The opinion did not discuss a rational basis for permitting some types of gambling and prohibiting others.

In *Finish Line Express, Inc. v. City of Chicago* (1978), 72 Ill. 2d 131, 379 N.E.2d 290, the supreme court upheld the validity of section 39.1 of the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—39.1). That section provided that accepting a fee for delivering money to a racetrack for wagering on horse races was a felony. The court stated that it was "undisputed that gambling is an activity which is subject to regulation or to complete prohibition," and that the prohibitions of section 39.1 were "clearly within the police power of the legislature." *Finish Line*, 72 Ill. 2d at 138, 379 N.E.2d at 292.

The *Finish Line* court further noted the State could utilize its po-

lice power to protect its sources of revenue and to assure the collection of taxes. (*Finish Line*, 72 Ill. 2d at 140, 379 N.E.2d at 293.) As a rational basis for distinguishing the gambling activity prohibited in *Finish Line* from that permitted, the court explained that the activity being prohibited, if allowed, could diminish the betting at the tracks and lower the governmental revenue obtained from that betting.

In each of the cited cases, no strict scrutiny is placed upon the distinction made between legal and illegal betting. Only a rational basis standard is used. No public policy against gambling now exists to impede the power of the legislature to make the relatively slight distinctions required. Here, regulating and taxing the slot machine types of gambling, which we will describe, would be difficult when done in taverns. On the other hand, both regulation to assure fair dealing and taxation to obtain needed governmental revenue would be much easier when occurring, as permitted, on licensed riverboats.

For the same reasons that a rational basis exists to prohibit the type of gambling involved here and to permit other types of gambling, sections 28—1(b) and 28—8 of the Code, taken together, properly provide for a cause of action for a loser at gambling prohibited by section 28—1, but not for the loser at gambling exempted under section 28—1(b). Every aspect of the scheme of article 28 of the Code involved here meets constitutional muster.

■ We now turn to the question of the sufficiency of the proof to support the verdict. At trial, Moushon testified as follows: (1) during the period from August 1, 1991, through January 15, 1992, she was a patron of Linda's Place and would go there four to six times per week to play video slot machines; (2) her favorite machine was called "Cherry Master," which could be played by inserting amounts ranging from 25 cents up to a $20 bill; (3) the object of the Cherry Master game was to accumulate points by matching three objects in a row, either vertically, horizontally, or diagonally; (4) if a player accumulated at least 200 points, she could cash in those points for $10; (5) if she wanted to cash out, the bartender would give her the cash; (6) she won some money, but she lost more than she won; (7) when she won money, she would put it back in the machine and keep playing; (8) in a typical week, she would play the Cherry Master machine or another video slot machine four to six days for approximately four hours at a time; (9) she used money she had gotten from cashing checks or withdrawals from her automatic teller machine (ATM); and (10) she cashed approximately 30 checks at the Jewel Store, Shop and Save, and Linda's Place, and she made 20 to 25 withdrawals from an ATM to spend on the video machines for a total of $1,989.

On cross-examination, Moushon admitted that she determined how much she had spent by constructing a record based upon bank statements, cancelled checks, and ATM receipts approximately one month after she stopped going to Linda's Place. She also admitted that she stopped payment on three checks totaling $190 that she had cashed at Linda's Place, because a machine had allegedly malfunctioned. Moushon stated the actual time she spent going into Linda's Place was from the first part of September 1991 until October 1991. She stated she constructed the record in late October or November 1991. She said she made "mental notes" of how much money she was spending earlier, but she did not make a written record until later. She stated many of the checks were written to "cash" but approximately 20 checks were written to "Linda's Place." She said she did not go back to Linda's Place after she stopped payment on the three checks written to Linda's Place on October 12, 1991.

Moushon testified that after she stopped going to Linda's Place, she started going to the Fleetwood and another bar to play similar machines. She said she played at the Fleetwood from the middle of November 1991 until January 15, 1992. She indicated she cashed checks at the Fleetwood, and, in January 1992, she stopped payment on six checks totaling $305, which she had cashed there. On the stop payment order, she stated that "gambling" was the reason for stopping payment. She said she did not return to the Fleetwood after she stopped payment on those checks.

Charles McMasters testified he was living with Moushon and was unemployed because of a back injury. He said he and Moushon would usually go to Linda's Place four or five times each week for up to seven or eight hours. He said the length of time they spent there "would all depend on how the machines were doing." McMasters stated Moushon usually played "bad," and by "bad," he meant "it would break us." He indicated they would sometimes spend $400 in one night on the machines. McMasters claimed the bartender would pay a nickel for every point, but the player had to have at least 200 points to get paid. He said one of the bartenders or Chuck Frank would take the money out of the cash register or out of the machine itself. He stated that he saw someone from Linda's Place make a cash payment approximately 75 to 150 times. McMasters admitted he had an "alcohol problem" and had been convicted of possession of cocaine.

Linda Frank and Chuck Frank both testified as adverse witnesses under section 2—1102 of the Civil Practice Law (735 ILCS 5/2—1102 (West 1992)). Linda testified that she was the owner of Linda's Place, and her husband, Chuck, was the owner of AAA. She stated that

AAA supplied Linda's Place with certain machines, including pool tables, cigarette machines, video slot machines, and video poker machines, and she and Chuck had an oral agreement to split evenly any proceeds from those machines. Linda testified that, to her knowledge, no one who worked for either company, including her husband or herself, made any cash payments based on any of the game machines. She stated, however, that she usually left the bar at 9 a.m. to take care of her mother.

Chuck Frank gave testimony similar to Linda's regarding the ownership of the two businesses. He also stated that Linda's Place had a policy of cashing checks for patrons and had cashed numerous checks for Moushon in September and October 1991. Frank further testified that "at no time" was there any payment made by either AAA or Linda's Place to any patron, based upon the results of the video slot machines. He indicated, however, that the bartenders were instructed to give credit if the patrons wanted to keep playing the machines and to issue credit slips if they wanted to quit playing, to be used at a later date.

Foy Duane Wilson also testified for plaintiff. He said he had been employed by AAA from July 1991 until February or March 1992. He testified that during that time, he observed someone from AAA or Linda's Place make cash payments to people playing the Cherry Master video machine "many times." He stated these payments were based upon the number of points indicated on the machine.

Chuck Frank then testified for defendants and described how the video machines worked and how the player accumulated points. He again denied that he or any other employee made any cash payments for points.

Gloria Moushon was called by defendants pursuant to section 2—1102 of the Civil Practice Law. She identified certain bank statements that belonged to her. She also identified 39 cancelled checks that she had written to "Cash," "Jewel," "Shop & Save," and "Linda's." She stated those 39 checks reflected the money she spent at Linda's Place on the Cherry Master machine. She said she put all of the money she received into the machines. She also identified receipts from an ATM machine which she stated reflected cash she spent at Linda's Place on the video machine.

Kathy Palmer testified that she was currently employed as a bartender at Linda's Place and may have been working there at some time during the period from September 1, 1991, to October 12, 1991, but not the whole time. She said she never made payouts to anyone for playing any of the video machines, and she never saw anyone make any payouts.

Timothy Day then testified for defendants. He said in November 1991, he was dating Moushon's daughter and was acquainted with Moushon and McMasters. He stated that he was at their residence in November 1991 and overheard a conversation between Moushon and McMasters related to their using the video machines at the Fleetwood. They allegedly stated they would write checks, and if they lost money, they would cancel payment, because they believed the Fleetwood could not force them to pay on a gambling debt under the statute in question. Day thought that McMasters claimed he had a gambling problem.

On cross-examination, Day stated this conversation took place in November 1991, but he could not recall the date or day of the week. He admitted he had also gambled on video machines at the Fleetwood and "various establishments" and that he had a problem with alcohol. He said Moushon and McMasters indicated they had written checks to the Fleetwood in November 1991 and had stopped payment on the checks if they lost money. He identified the checks to the Fleetwood where payment had been stopped and noted the dates of the checks were in January 1992.

In rebuttal, Moushon testified that she knew Day, because he dated her daughter. She denied that the conversation to which Day testified ever took place. McMasters also denied participating in such a conversation and said that although he had seen Day one time, at his house, with his girlfriend's daughter, he did not know him.

The jury could have believed Moushon's testimony sufficiently to justify an award of $1,252. The Franks argue that because Moushon calculated her total loss at $1,989 and the jury awarded only $1,252, it did not believe her. We do not agree. The jury could have concluded that Moushon included in her total of losses at places where the Franks were involved money she actually lost at other establishments.

■ The contention that the court erred in instructing the jury and by communicating with the jury arose when, during deliberations, the jury sent out a note asking "Are we limited in the amount of the award to $1[,]989.00 or $1[,]989.00 less $190.00 or can we determine another amount." The attorneys were not in the courtroom, and the trial judge responded by writing on the jury's note: "You may fix any amount you think proper under the facts and the law." The court later informed the attorneys about the communication, and there was no objection by either party. The jury then returned the verdict. The judge's response was neutral and did not prejudice the Franks. Under those circumstances, no reversible error resulted. *People v. Tilley* (1952), 411 Ill. 473, 478, 104 N.E.2d 499, 502;

*Nelson v. Hydraulic Press Manufacturing Co.* (1980), 84 Ill. App. 3d 41, 49-50.

■ The Franks' contention that Moushon perpetrated a fraud on them and the court arises from the testimony of Timothy Day that she might have been using the Franks' games in order to create a cause of action against them under section 28—8 of the Code. Day testified that he had "problems" with alcohol and that he also had gambled on video machines. In addition, his testimony regarding the date that plaintiff had stopped payment on the checks in November 1991 was two months prior to the date in January 1992 that payment had actually been stopped. The jury could have heard this evidence and not believed that plaintiff had committed fraud.

Accordingly, for the reasons stated, we affirm.

Affirmed.

McCULLOUGH, P.J., and STEIGMANN, J., concur.