THOMAS REUTER, Plaintiff-Appellant, v. MASTERCARD INTERNATIONAL, INC., *et al.*, Defendants-Appellees.

Fifth District   No. 5—07—0372

Opinion filed January 5, 2010.

Stephen M. Osborne, of The Sharp Law Firm, P.C., of Mt. Vernon, and Bruce A. Beeman, of Wolter, Beeman & Lynch, of Springfield, for appellant.

William P. Hardy and J. William Roberts, both of Hinshaw & Culbertson LLP, of Springfield, and Colleen Kennedy, Daniel H. Bookin and Randall W. Edwards, all of O'Melveny & Meyers LLP, of San Francisco, California, for appellee Visa U.S.A., Inc.

R. Mark Mifflin, of Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, and Marianne Short, of Dorsey & Whitney, LLP, of Minneapolis, Minnesota, for appellee U.S. Bank National Association, N.A.

R. Mark Mifflin, Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, and Jim McCabe and Gregory P. Dresser, both of Morrison & Forester, LLP, of San Francisco, California, for appellees Bank of America, N.A., Fleet Bank, N.A., MBNA America Bank, N.A.

Brian T. Schurter, of Tummelson Bryan & Knox, LLP, of Urbana, for appellee Busey Bank of Urbana.

Thomas H. Wilson, of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellees First USA Bank, N.A., and Chase Manhattan Bank USA, N.A.

Lawrence J. Kwacala, of Flack, McRaven & Stephens, of Macomb, for appellee Federal Deposit Insurance Corp., as receiver for Citizens National Bank of Macomb.

Paul E. Adami, Fred C. Prillaman, and Joel A. Benoit, all of Mohan, Alewelt, Prillaman & Adami, of Springfield, and Jay N. Fastow, of Dickstein Shapiro, LLP, of New York, New York, for appellee MasterCard International, Inc.

Lorilea Buerkett and Eric L. Grenezebach, both of Brown, Hay & Stephens, of Springfield, for appellee United Community Bank.

Karen L. Kendall and Frederick P. Velde, both of Heyl, Royster, Voelker & Allen, of Peoria, and Christopher R. Lipsett, of WilmerHale, of New York, New York, for appellee Citigroup, Inc.

JUSTICE CHAPMAN delivered the opinion of the court:

■ This appeal involves section 28—8 of the Criminal Code of 1961 (720 ILCS 5/28—8 (West 1998)). That section provides that any person who loses money or any other thing of value through illegal gambling may recover what was lost from the winner. 720 ILCS 5/28—8(a) (West 1998). If the gambler does not bring a suit to recover his or her losses within six months of the time they occur, any other individual may bring a civil suit for damages triple the amount lost by the gambler. 720 ILCS 5/28—8(b) (West 1998). The plaintiff brought the instant lawsuit under this second provision. His complaint named as defendants MasterCard International, Inc., Visa U.S.A., Inc., and several banks that issued MasterCard and Visa credit cards to Illinois consumers who used their credit cards to gamble on Internet casinos. At issue is whether these defendants are "winners" under the statute. The trial court held that they are not and, accordingly, granted the defendants' motion to dismiss. We affirm that ruling.

On March 3, 2000, the plaintiff, Thomas Reuter, filed a 23-count complaint seeking damages under section 28—8(b) of the Criminal Code of 1961 (720 ILCS 5/28—8(b) (West 1998)). That section provides that if a person who lost at illegal gambling does not bring a suit to recover his losses within six months, any person may bring an action against the winner for three times the amount lost. 720 ILCS 5/28—8(b) (West 1998). This provision is intended to serve as an enforcement mechanism. *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th

Cir. 1997) (applying Illinois law). The complaint alleged a civil conspiracy to operate online casinos, a form of gambling that is illegal in Illinois. The plaintiff sought treble damages under section 28—8(b) for the losses of an individual named Glenn Lee, as well as the unspecified losses of unnamed Illinois cardholders.

Count I of the complaint alleged that defendants MBNA Corp. (MBNA) and MasterCard International, Inc. (MasterCard), conspired to violate section 28—1 of the Criminal Code of 1961 (720 ILCS 5/28—1 (West 1998)), which prohibits many forms of gambling. The plaintiff alleged the following facts. MBNA is a bank that issues credit cards to Illinois consumers through defendant MasterCard. MBNA and MasterCard have a "merchant agreement" with a company called Intersafe Global, which is identified as the "cashier" on Internet casino sites. Gamblers visiting these sites can use their credit cards to purchase virtual chips from Intersafe Global, which they can then use to place bets. According to the complaint, MBNA and MasterCard knew that Intersafe Global and other similar companies (referred to in the complaint as "gambling finance companies") worked directly with online casinos, including Casino-on-Net, the Internet casino that Glenn Lee used. The complaint alleged that MasterCard's logo appears on the Casino-on-Net site. None of the Internet casinos or gambling finance companies are named as defendants in the complaint.

Count I further alleged that pursuant to its merchant agreements with MBNA and MasterCard, Intersafe Global paid these defendants a fixed percentage of the money that cardholders spent purchasing Internet gambling chips to place bets on Casino-on-Net. Any winnings were credited to the gambler's credit card account if a balance on the card was "due and owing."

MBNA issued a Platinum Plus MasterCard to Glenn Lee, who used the card to purchase $49,500 in virtual chips from Intersafe Global. Lee gambled with these chips on Casino-on-Net between January 1, 1999, and September 2, 1999, and lost the entire $49,500. The complaint alleged that any periodic winnings Lee received during this period were credited to his MBNA MasterCard account. In count I of his complaint, the plaintiff sought $148,500 (three times the amount Lee lost) pursuant to section 28—8(b). The plaintiff alleged that MBNA and MasterCard were liable for these losses because (1) they were "winners" under the statute and (2) they were liable for the losses as coconspirators with the Internet casinos and gambling finance companies.

Count II of the complaint also alleged that MasterCard and MBNA conspired to violate Illinois gambling laws. Count II contained essentially the same factual allegations as count I, but it alleged a

broader conspiracy with additional victims. More specifically, the plaintiff alleged that MBNA and MasterCard had merchant agreements not only with Intersafe Global but with one or more of the other Internet gambling finance companies listed in a one-page exhibit attached to the complaint. He further alleged that these finance companies allowed gamblers to purchase chips from one or more of the online casinos listed in a nine-page exhibit attached to the complaint. He alleged that between September 1997 and September 1999, Illinois residents used their MBNA MasterCards to gamble online and lost "large sums of money" doing so. As damages, the plaintiff sought three times the amount the court would find to have been lost by all Illinois cardholders except for Glenn Lee.

The remaining 21 counts of the complaint alleged identical civil conspiracies between MasterCard and several other banks that issue credit cards through MasterCard and between Visa and banks (including MBNA) that issue Visa credit cards. In each, the plaintiff sought damages in unspecified amounts for three times the losses of all Illinois cardholders except for Glenn Lee.

On May 12, 2000, the defendants filed a joint motion to dismiss the complaint pursuant to both sections 2—615 and 2—619 of the Code of Civil Procedure (735 ILCS 5/2—615, 2—619 (West 1998)). They alleged that (1) all 23 counts of the complaint failed to state a cause of action because they did not allege facts demonstrating that the named defendants are "winners" under the statute and (2) counts II through XXIII of the complaint additionally failed to state a claim because the plaintiff did not identify any gambling losses subject to recovery under the statute and the plaintiff cannot bring an action "on behalf of an unidentified putative statewide class of alleged losers at gambling." In addition, they alleged that (1) all 23 counts are preempted by federal banking laws, (2) the gambling finance companies and Internet casinos are indispensable parties, and (3) the dispute is subject to mandatory arbitration clauses in the consumer credit card agreements (see 735 ILCS 5/2—619(9) (West 1998)).

On August 4, 2000, the plaintiff filed his response to the defendants' motion to dismiss. Attached to the plaintiff's response were two lengthy appendices. In relevant part, the appendices contained an affidavit of Glenn Lee and a letter from the customer satisfaction department of MBNA. The affidavit was notarized on July 31, 2000. In it, Lee averred that in January 2000, he sent a certified letter to MBNA requesting that MBNA issue a letter authorizing Casino-on-Net to wire any of Lee's winnings directly to him. He further averred that he received a letter in response "declining [his] request but congratulating [him] on [his] recent luck with [his] Casino-

on-Net transactions." That letter, dated March 15, 2000, is also included in the appendices, and it states in relevant part as follows:

"We congratulate you on your recent luck with your Casino-On-Net transactions. However, MBNA is not able to dictate to the merchant the method used to dispose your winnings. Whenever a merchant charges an account for a particular transaction, it is normal for any subsequent transactions related to the initial transaction to be credited against the same account."

On September 6, 2000, the plaintiff filed a motion for leave to file an amended complaint. He sought to amend the complaint to seek damages for the gambling losses incurred by Illinois cardholders up through February 2000. On September 21, 2000, the court held a hearing and heard arguments. No transcript or bystander's report of that hearing appears in the record. The court took the matter under advisement.

On August 2, 2001, the plaintiff filed a renewed motion to amend his complaint, again seeking damages for gambling losses incurred up to February 2000. On August 31, the trial court granted the motion for leave to amend over the objection of the defendants.

On October 19, 2001, the court entered a detailed written order granting the defendants' motion to dismiss the entire complaint. The court noted that the primary issue in this case is whether the defendants are "winners" under the statute. The court cited dictionary definitions for the terms "win" and "winner," noting that a "winner" is defined as " 'a person or thing that wins' " and that "win" is defined as " 'to gain a victory; succeed; to gain in competition, as a prize, victory as in a contest.' " The court then explained that the statute is penal in nature and must therefore be strictly construed. The court rejected the plaintiff's argument that a strong public policy against gambling dictated a more liberal construction of the statute. In doing so, the court noted that many forms of gambling which were once illegal had been legalized, evincing a more "relaxed attitude" toward gambling. The court found that the defendants' role in the gambling transactions was complete prior to any gambling occurring. The court further found that the amount of profit earned by the defendants for providing basic financial services did not depend on the outcome of the gambling. That is, the gamblers would owe the defendants the same amount whether they won or lost. Similarly, the fee charged to the casinos and finance companies for transferring money is based on the amount of chips purchased, not the outcome of any bets placed.

The court briefly addressed the additional issues raised by the defendants. The court found that these issues were moot in light of its

finding that the defendants were not "winners." The court stated, however, "[I]t does appear to this Court that the Internet Finance Companies and Internet Casinos are necessary parties, that the claims against the National Banks are preempted by Federal Law, and that the Plaintiff has attempted to state a claim for a class of individuals without certifying the class and without specifying with certainty the names or damages of the class." The court also stated that the arbitration clause did not appear to be applicable, based on the penal nature of the statutory claim. The court dismissed the plaintiff's complaint with prejudice.

On October 22, 2001, the plaintiff filed a motion for leave to file a second amended complaint. We note it appears that, although the court had already entered its order dismissing his complaint, the plaintiff had not yet been notified of the ruling. The motion sought to amend the complaint to add additional damages for gambling losses incurred between September 2000 and April 19, 2001.

On November 16, 2001, the plaintiff filed a motion to reconsider the court's October 19 order. He asked the court to reconsider the findings it had made and to address his civil conspiracy theory, which was not expressly addressed in the court's order. In addition, he argued that the court erred in dismissing his complaint with prejudice rather than allowing him an opportunity to amend it further. He contended that, if given the opportunity to do so, he would have amended his complaint to include a claim based on a theory that the defendants aided and abetted illegal gambling.

On February 4, 2002, the defendants filed a response to the plaintiff's motion to reconsider. They argued that the motion should be denied because the plaintiff did not raise any arguments not previously presented to the court. They further argued that the implicit request to amend the complaint to add a claim based on an aiding-and-abetting theory of liability could not be raised for the first time in a motion to reconsider.

The motion to reconsider remained pending for five years. On June 4, 2007, the court made a docket entry denying the motion to reconsider and the motion to file a second amended complaint. The court found that all the arguments raised in the motion for reconsideration had been considered when the court made its initial ruling and that the named defendants were not "winners" as required for a recovery under the statute. This appeal followed.

■ The plaintiff argues that the court erred in dismissing his complaint. He contends that (1) the credit card and bank defendants are "winners" under the statute because they had a stake in the outcome of the gambling, (2) alternatively, they are liable as

coconspirators under a civil conspiracy theory, (3) the casinos and financing companies are not necessary parties, (4) the plaintiff's claims against the bank defendants are not preempted by federal bank regulations, and (5) the plaintiff has not tried to maintain a class action. He further contends that the court erred in not allowing him a further opportunity to amend his complaint. The defendants argue that we may affirm the court's dismissal of counts II through XXIII of the complaint on the basis that they did not allege recoverable losses with sufficient specificity. We find that the court properly dismissed the complaint for a failure to state a claim because (1) the named defendants are not "winners" under the statute and (2) the plaintiff has not alleged either his own damages or facts showing the concert of purpose necessary to maintain a cause of action for civil conspiracy. We also find that the court did not err in failing to offer the plaintiff the opportunity to further amend his complaint where he did not ask for this opportunity. Because of these conclusions, we need not consider the additional issues raised by the parties.

This case comes to us after a dismissal pursuant to section 2—615 of the Code of Civil Procedure. On appeal, we must take all well-pled facts in the plaintiff's complaint as true and draw reasonable inferences from the facts pled in favor of the plaintiff. We need not, however, accept as true any conclusions that are asserted unless they are supported by sufficient specific factual allegations. *Pawlikowski v. Toyota Motor Credit Corp.*, 309 Ill. App. 3d 550, 555, 722 N.E.2d 767, 770 (1999). We review the court's ruling *de novo*. *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 499, 911 N.E.2d 369, 373 (2009).

The plaintiff first argues that his complaint alleged sufficient facts to show that the named defendants are "winners" under the statute. We disagree.

We first note that neither party has pointed us to a case decided under Illinois law that is directly analogous to the one before us, and we have found none. Two federal cases cited by the defendants—*In re MasterCard International Inc.*, 313 F.3d 257 (5th Cir. 2002), and *Jubelirer v. MasterCard International, Inc.*, 68 F. Supp. 2d 1049 (W.D. Wis. 1999)—involve facts nearly identical to those presented here, but both involve claims for civil damages under the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §1961 *et seq.* (1994)), which requires proof of additional elements that are not relevant here. In order to sustain a claim under RICO's civil remedy provision (18 U.S.C. §1964 (1994)), a plaintiff must demonstrate a pattern of racketeering activity or the collection of an illegal debt. *In re Master-Card International Inc.*, 313 F.3d at 261.

In order to demonstrate a pattern of racketeering activity, a plaintiff must show two or more predicate acts, which can be violations of either state law or federal law. *In re MasterCard International Inc.*, 313 F.3d at 261-62. In addition, the plaintiff must show that these predicate acts are related to the establishment, acquisition, operation, or control of an illicit enterprise and that the defendant participated in the management or operation of that enterprise. *In re MasterCard International Inc.*, 313 F.3d at 261. The *Jubelirer* court focused its analysis on the second element. *Jubelirer*, 68 F. Supp. 2d at 1052 (finding the allegations in the plaintiff's complaint insufficient to support the existence of an enterprise). Thus, we do not find it particularly helpful. The *In re MasterCard International Inc.* court, however, focused its analysis on whether the plaintiffs there adequately alleged as predicate acts violations of Kansas and New Hampshire gambling statutes. *In re MasterCard International Inc.*, 313 F.3d at 262. Thus, while it is not fully dispositive, we find the court's analysis helpful.

There, the plaintiffs alleged facts nearly identical to those alleged here. The plaintiffs alleged that Internet gamblers used credit cards to purchase "credits" they could then use to gamble on Internet casino sites. They further alleged that the credit card companies facilitated illegal online gambling by authorizing the casinos to accept their cards, extending credit to gamblers, and placing their logos on the casino sites. *In re MasterCard International Inc.*, 313 F.3d at 260. The court found these allegations insufficient to support a claim that the credit card companies had violated either state gambling statute because the credit card companies "completed their transaction with the [p]laintiffs *before* any gambling occurred." (Emphasis in original.) *In re MasterCard International Inc.*, 313 F.3d at 262.

We agree with the Fifth Circuit's analysis. The defendants here earn a profit from the transactions involved in two ways. First, they charge the finance companies a percentage of the funds forwarded to them on behalf of the cardholders purchasing chips. This occurs before any gambling takes place and is not affected by the outcome of the gambling. Second, if cardholders do not pay their balances in full, the defendants charge interest or finance charges at the end of the billing cycle. Depending on the billing cycle, this may occur before or after the gambling occurs, but it is based on an obligation to repay a loan that had been incurred before any gambling took place.

The plaintiff argues that the instant case is different from *In re MasterCard International Inc.* because there, the Internet casinos wired any net winnings directly to online gamblers rather than crediting the credit card accounts they used to buy their virtual chips. See

*In re MasterCard International Inc.*, 313 F.3d at 260. Here, by contrast, the plaintiff has alleged that Casino-on-Net credited Glenn Lee's winnings to his MBNA MasterCard account. This distinction is significant, he argues, because cases decided under Illinois's statute have defined "winner" broadly to include any party "to whom illegal gambling losses are paid or delivered," even if that party was a "third-party facilitator" of the illegal gambling. He argues that the fact that the winnings are credited to the gamblers' credit card accounts gives the defendants here a stake in the outcome of the gambling. We are not persuaded.

We first note that the only time a credit is made to a cardholder's account is when that cardholder *wins* money, not when he loses. The statute only applies to gambling losses, not winnings. Second, the winnings are credited to the cardholder's own account, thereby reducing his balance. The letter from MBNA's customer satisfaction department to Glenn Lee noted that this is a common practice for merchants accepting credit cards. We cannot accept the plaintiff's contention that crediting cardholders' winnings to their credit card accounts constitutes the payment or delivery of a gambling loss.

We find equally unavailing the plaintiff's argument that this practice gives the defendants a stake in the outcome of their cardholders' gambling. As previously noted, one of the ways the defendants earn a profit is by charging a merchant fee to the Internet finance companies for forwarding them cash. This fee is a percentage of their sales, which obviously means that the more virtual chips an Internet gambler buys, the more the defendants profit from the merchant fee. At oral argument, the plaintiff pointed out that gambling can be an addiction, and he argued that by crediting the winnings to a gambler's account, rather than wiring him cash, the casino sites and the defendants induce the gambler to place further bets in order to try to break even. We note, however, that a gambling addiction can be fed as much through wins as through losses. A loss can prompt a gambler to try to win it back, while a win can give the gambler false hope that he might win even more if he keeps betting. This phenomenon does not appear to be dependent upon the method used to pay the gambler any winnings.

The defendants also profit by charging interest and finance charges to cardholders who carry a balance. To an extent, the amount charged can be affected by the outcome of the cardholders' forays into online gambling. Presumably, if a substantial amount of money is credited to a cardholder's account—such as the $10,000 that was credited to Glenn Lee's account—the interest on the remaining balance would be lower than the interest that would have been charged

had the balance not been reduced by the large credit. We first note that relying on this fact to demonstrate a stake in cardholders' gambling is somewhat inconsistent with the plaintiff's argument that applying credits to gamblers' credit card accounts amounts to the delivery or payment of a gambling loss to the defendants. We also think that this is insufficient to give the defendants a true stake in the outcome of their cardholders' online gambling. For one thing, small winnings would have only a slight impact on the balance and a negligible impact on the interest charged on the balance. Further, too many other variables affect the amount of interest the defendants charge—for example, how much the cardholder pays each month and whether the cardholder takes advantage of the credit to charge more items using the credit card. Moreover, none of the cases cited by the plaintiff convince us that the statutory definition of a "winner" is broad enough to include the defendants here. None of those cases involve "third-party facilitators" who might realize an incidental benefit from a gambler's loss; thus, they do not address the issue of when such a party may be liable under the statute, if at all.

*Pearce v. Foote*, 113 Ill. 228 (1885), and *Kruse v. Kennett*, 181 Ill. 199, 54 N.E. 965 (1899), each involved contracts for the sale of grain futures. At the time these cases arose, these sales were illegal gambling contracts under Illinois law. *Kruse*, 181 Ill. at 203, 54 N.E. at 966. *Pearce* involved a promissory note that obliged the purchaser of grain futures to pay the brokerage firm that had sold him the futures. The purchaser's estate sued the assignee of the note to recover the value of the note under a predecessor statute to section 28—8(a) of the Criminal Code of 1961. *Pearce*, 113 Ill. at 232-33. In relevant part, the issue before the court was whether the brokerage firm was a winner under the statute. *Pearce*, 113 Ill. at 232-33.

We note that there, unlike here, the brokerage firm had a contract with the purchaser to do something that was then illegal gambling. In other words, it was a direct participant in the illegal gambling. Pursuant to that contract, if the price of grain fell (and the purchaser therefore lost the bet), he was to pay money to the brokerage firm. *Pearce*, 113 Ill. at 237. If the price rose (and he therefore won the bet), the brokerage firm was to pay the purchaser. *Pearce*, 113 Ill. at 237-38. The assignee of the note, however, argued that the brokerage firm was not a winner under the statute because it had contracts with other dealers on the board of trade which required it to pay to them what it won from the purchaser. *Pearce*, 113 Ill. at 238. In essence, this is an argument that the brokerage firm won nothing because it did not profit. The court rejected this argument, finding that the purchaser owed the money lost on his wager directly to the brokerage firm and

that "he neither knew nor cared to whom [the brokerage firm] may have paid any portion or all of that which [it] obtained from him." *Pearce*, 113 Ill. at 238.

*Kruse* also involved a contract for the sale of grain futures. The defendant there made essentially the same argument that the broker was not a winner under the statute. *Kruse*, 181 Ill. at 205, 54 N.E. at 967. The court held that the case before it was controlled by *Pearce*. *Kruse*, 181 Ill. at 205, 54 N.E. at 967.

The difference between the situation presented by *Pearce* and *Kruse* and that presented here is obvious. In those cases, the defendants directly participated in gambling. Thus, neither *Pearce* nor *Kruse* even addresses the role of a "third-party facilitator."

The plaintiff also cites cases involving types of gambling that are more familiar to modern Illinoisans. *Zellers v. White*, 208 Ill. 518, 70 N.E. 669 (1904), involved gambling on a poker game, and *Moushon v. AAA Amusement, Inc.*, 267 Ill. App. 3d 187, 641 N.E.2d 1201 (1994), involved video poker and slot machines. Neither supports the plaintiff's arguments.

In *Zellers*, the defendant owned a saloon and operated two gaming rooms on the second floor of the building housing his saloon. *Zellers*, 208 Ill. at 519, 70 N.E. at 669. The plaintiff lost $80 playing poker there. He played many hands of poker against several men, including two (Downey and Kaiser) who were employees of the defendant. *Zellers*, 208 Ill. at 519-20, 70 N.E. at 670. Unlike the other poker players, Downey and Kaiser did not have to pay for the chips they used to bet on the game. At the end of the night, their chips belonged to the defendant; Downey and Kaiser did not redeem the chips they had won for cash. *Zellers*, 208 Ill. at 520, 70 N.E. at 670. The defendant argued that he was not a winner from whom the plaintiff could recover his gambling losses because he did not personally play in the poker game. *Zellers*, 208 Ill. at 524, 70 N.E. at 671. In rejecting this contention, the supreme court pointed out that Downey and Kaiser played poker as the defendant's agents. The court therefore held that he was responsible for their actions. *Zellers*, 208 Ill. at 524, 70 N.E. at 671. The court simply applied basic agency principles in finding that the defendant was the winner of the poker game. It did not have to consider whether a "third-party facilitator" could be considered a winner under the statute.

The only case the plaintiff cites involving a defendant who might be considered a "third-party facilitator" is *Moushon*. There, the defendants were a husband and wife. The wife owned a tavern and the husband owned a company that supplied pool tables, slot machines, and video poker machines to the tavern. *Moushon*, 267 Ill. App. 3d at

193-94, 641 N.E.2d at 1205. The husband and wife had an oral agreement to divide any proceeds from the machines equally between their two businesses. *Moushon*, 267 Ill. App. 3d at 194, 641 N.E.2d at 1205. The bartenders at the tavern regularly extended credit to patrons who wanted to continue playing the poker and slot machines. *Moushon*, 267 Ill. App. 3d at 194, 641 N.E.2d at 1206.

Arguably, the wife, who did not own the machines, facilitated the illegal gambling by allowing the machines to be placed in her tavern, as well as by extending credit to bar patrons to use the machines. However, we do not find any support in the case for the plaintiff's position. First of all, whether the wife was a winner under the statute was not an issue raised in the appeal. See *Moushon*, 267 Ill. App. 3d at 188, 641 N.E.2d at 1202. Moreover, she directly shared in the profits from video poker and slot machines owned and maintained by her husband. This is very different from the case before us.

The plaintiff next contends that he has alleged facts sufficient to support a claim for liability under a theory of civil conspiracy. The defendants argue that the plaintiff lacks standing to bring this claim because he did not allege that he lost money or suffered any injury as a result of the defendants' actions. See *Glisson v. City of Marion*, 188 Ill. 2d 211, 221, 720 N.E.2d 1034, 1039-40 (1999) (explaining that standing requires that a plaintiff have a distinct and palpable injury that can be redressed by the court). We note that standing is an affirmative defense, which is the defendant's burden to plead and prove. *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 22, 809 N.E.2d 1240, 1243 (2004). The defendants did not raise a lack of standing as an affirmative defense in their motion to dismiss. Thus, they have waived their objection to the plaintiff's standing. This does not mean, however, that the plaintiff has a right to recover without alleging any damages, which, as we will explain, is a necessary element of the cause of action. We find that the complaint failed to state a claim for civil conspiracy.

Civil conspiracy is an intentional tort. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133, 720 N.E.2d 242, 258 (1999). It is defined as " 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.' " *McClure*, 188 Ill. 2d at 133, 720 N.E.2d at 258, quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23, 694 N.E.2d 565, 571 (1998). To state a claim for civil conspiracy, a plaintiff must allege facts establishing both (1) an agreement to accomplish such a goal and (2) a tortious act committed in furtherance of that agreement. *McClure*, 188 Ill. 2d at 133, 720 N.E.2d at 258. In addition, the plaintiff must allege an injury caused by the defendant. *Pawlikowski*, 309 Ill. App. 3d at 564, 722 N.E.2d at 777. A

conspiracy, by its very nature, is secretive; therefore, the agreement is rarely susceptible to direct proof. *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258. However, Illinois is a fact-pleading jurisdiction; a plaintiff must therefore allege sufficient facts to bring his claim within the cause of action he asserts. *Turner*, 233 Ill. 2d at 499, 911 N.E.2d at 373. Conclusory allegations that the defendants agreed with others to achieve some illicit purpose are not sufficient. *Pawlikowski*, 309 Ill. App. 3d at 555, 722 N.E.2d at 770.

Here, the plaintiff's complaint does not contain sufficient facts to support either an agreement or damages. He alleged that the defendants agreed with the online casinos and Internet finance companies to engage in illegal gambling. He further alleged that the defendants entered into merchant agreements with the finance companies and extended credit to Illinois consumers while knowing that the finance companies had agreements with the casinos and knowing that Illinois cardholders could and did gamble online with their credit cards. The allegation that the defendants knew what the finance companies were doing is supported by a quick glance at the list of finance companies. Some of the names on the list make it glaringly obvious that the companies exist for the sole purpose of facilitating online gambling (names such as "Web Players," "Casino Affiliate Network," and "Winners Network"). However, these allegations do not include any facts to support an *agreement*. Merely alleging that a party knows that the acts of another are illegal is not enough to show a conspiracy (*McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258), and merely characterizing "a combination of acts as a conspiracy is insufficient to withstand a motion to dismiss" (*Buckner*, 182 Ill. 2d at 23, 694 N.E.2d at 571).

In addition, the plaintiff failed to allege that he suffered any damages as a result of a tort committed in furtherance of the alleged conspiracy. The purpose of the civil conspiracy theory is to extend liability for a tort beyond the actual tortfeasor to any coconspirators who might have encouraged, facilitated, or planned the tort in furtherance of the conspiracy. *McClure*, 188 Ill. 2d at 133, 720 N.E.2d at 258. In order to extend liability, there must be liability to extend. Damages for an injury to the plaintiff are an essential element of any tort cause of action. There is no basis on which to substitute statutory damages under a criminal statute for this key element. We thus conclude that the plaintiff failed to state a claim for civil conspiracy.

■ Finally, the plaintiff contends that the court erred by "denying [him] an opportunity to amend his complaint" to add claims based on the theory that the defendants aided and abetted illegal gambling. There is no evidence in the record that he sought to amend his

complaint to add that claim. He merely asserted in his motion to reconsider that, if allowed to do so, he "would have" filed an amended complaint adding that claim. That motion remained pending before the court for more than five years, during which time the plaintiff never sought to file a proposed amended complaint. In general, leave to amend pleadings is to be liberally allowed. However, a plaintiff does not have an absolute right to amend his complaint. *Lordahl v. Mauro*, 109 Ill. App. 3d 478, 481, 440 N.E.2d 989, 991 (1982). A court does not err in refusing to allow a plaintiff to amend a complaint if the proposed amendment will not cure the defects in the pleading. *Lordahl*, 109 Ill. App. 3d at 481, 440 N.E.2d at 991. Here, the plaintiff never presented the court with a proposed amendment; thus, the court could not determine whether the proposed amendment would state a claim. Moreover, as we have previously explained, the provision allowing any person to sue for treble damages for the gambling losses of another does not provide a cause of action against anyone other than a winner at illegal gambling. Thus, we agree with the defendants that it would not be possible for the plaintiff to state a cause of action for aiding and abetting illegal gambling. We find no error in the court's ruling.

For the foregoing reasons, we affirm the order of the trial court dismissing the plaintiff's complaint with prejudice.

Affirmed.

GOLDENHERSH, P.J., and WEXSTTEN, J., concur.